Forrest JOHNSON, Respondent,

v.

MINNESOTA DEPARTMENT
OF HUMAN SERVICES,
Appellant.

Nos. C5–96–2468, C7–96–2066.

Court of Appeals of Minnesota.

June 10, 1997.

**454**

Steven P. Elliot, Minnesota Disability Law Center, Minneapolis, for Respondent.

Hubert H. Humphrey, III, Attorney General, Jacqueline Moen, Assistant Attorney General, Paul M. Landskroener, Assistant Attorney General, St. Paul, for Appellant.

Considered and decided by PETERSON, P.J., and LANSING and CRIPPEN, JJ.

## OPINION

PETERSON, Judge.

The Minnesota Department of Human Services (Department) denied Forrest Johnson's request for prior authorization to use medical assistance funds to purchase a HiRider stand-up wheelchair. A chief appeals referee for the Commissioner of Human Services affirmed the Department's decision on grounds that Johnson failed to demonstrate that the HiRider was medically necessary and that it was the least expensive appropriate alternative health service available. On appeal to the district court, the district court concluded Johnson had established that the HiRider was medically necessary and the least expensive appropriate alternative. The Department now appeals from the district court order reversing the chief appeals referee's decision and from a second district court order directing the issuance of a writ of mandamus compelling the Department to immediately provide authorization for Johnson to obtain a HiRider. We affirm in part and reverse in part.

## FACTS

Respondent Forrest Johnson, currently age 39, was diagnosed with multiple sclerosis (MS) in 1990. MS is a progressive disease that causes myelin, a fat that coats nerves, to degenerate, and an individual's symptoms depend on where the myelin loss occurs. In Johnson's case, MS has caused weakness and stiffness in his legs, making him unable to stand or walk without assistance. Johnson's treating physician, Dr. Shapiro, and Johnson's physical therapist, Sharon Ruhsam, testified that Johnson's symptoms were unusual in that despite the extreme weakness in Johnson's legs, he maintained a high level of

cognitive functioning and the ability to use his arms, allowing him to continue living independently.

Dr. Shapiro testified that prolonged immobility of the human body causes many problems, including the nervous system and muscles atrophying, infections developing due to the breakdown of skin, loss of range of motion, and calcium leeching out of bones, making them more brittle and possibly causing urinary tract infections. Other evidence indicated that prolonged immobility may result in digestive problems. Dr. Shapiro testified that some of the complications resulting from prolonged immobilization require extensive and costly treatment. Passive standing can alleviate many of the problems caused by prolonged immobility, including bone calcium loss, urinary tract and bladder infections, muscle spasticity, muscle contractures, loss of range of motion, muscle atrophy, and decubitus ulcers. Passive standing also can improve bowel function, respiration, and circulation.

Johnson presented evidence that he has had urinary tract infections as a result of prolonged immobility and that his digestive system has been affected by prolonged immobility. Ruhsam and Johnson's occupational therapist, Ronna Linroth, stated that Johnson had an increased risk for bone demineralization because he used steroids to manage his MS and an increased risk for pressure ulcers because he had little padding over boney prominences and was unable to feel pain. Dr. Shapiro testified that both the likelihood of Johnson having complications from prolonged immobilization and the likelihood of passive standing lessening those complications were significant. Ruhsam and Linroth believed that passive standing would improve Johnson's respiration and significantly reduce his muscle spasticity. Ruhsam testified that passive standing would also improve Johnson's range of motion.

The HiRider is a combination power wheelchair and passive standing device that enables Johnson to move between sitting and standing positions by touching two buttons. Johnson testified that when he used the HiRider on a trial basis for about three months in 1995, his leg muscles became stronger, he did not have a bladder infection, and he noticed an improvement in his balance, muscle tone, digestion, and diaphragm function.

Linroth testified that the HiRider was the safest passive standing device for Johnson to use at home without another person assisting him:

> [J]ohnson can set himself up in [other passive standing devices] in order to be lifted up in them. Our standing frames that we have there are hydraulic manual pumps and so he would not be able to pump himself up into that independently. In the stander, when it has the power lift that [Johnson] was alluding to earlier, there's like a toggle switch where you lift yourself up and he could probably run that toggle but what happens is because of the bracing his arm gets cut down here and he has to loop up around them so there's danger for injury for one thing, but the other part of that is the gate that you close behind you. You have to be able to turn around to get that gate if you were doing it yourself. If he is, has his feet planted and he's got extensor tone locking him in, he's not going to be able to rotate around like that to get that. And if he gets it, and by hook or crook, [Johnson] might figure out a way to do that, what happens when you go to release it then, it slides back away from you so that you just have the belt to catch you and getting back down then becomes a real safety issue.

Linroth believed that the HiRider would be cost-effective given Johnson's age and the fact that intervention was occurring during an early stage in the development of Johnson's MS. Linroth testified that out of 300 people seen at the MS Achievement Center during the last ten years, Johnson was the only one for whom the Center had recommended a HiRider.

Dr. Shapiro explained that to benefit from passive standing, Johnson would need to get into a standing position several times daily and that the HiRider would enable him to do so. Dr. Shapiro testified that other passive standing devices would not be practical for Johnson:

> There are standing frames that you can get up and stand in just for yourself, but

most of those are ... you need people around to put you into the frame and you need people to take you down off the frame and you can only be up in the standing frame for a period of fifteen to twenty minutes and then somebody has to put you down and you go off and do something and then somebody has to put you back up again to get that benefit. We have had [Johnson] up in the stand frame. In a group situation where you have a lot of people who are going to stand, standing frames are fine, but to do what we really want to do with him, that's not very practical.

Dr. Shapiro also testified that during the previous 18 years, he had followed over 2,500 MS patients and had written only two prescriptions for a standing type of wheelchair.

Ruhsam testified that the progression of Johnson's MS was making it increasingly difficult for him to transfer from a wheelchair to a standing device:

> [E]ven though [Johnson's] talking about no problems with transfer, from my professional eye I am more and more concerned with that. Being able to have the HiRider, to me, would allow him an opportunity to decrease some of the transfers he has to do. Right now he's talking about five or six times a day he transfers. Every time he transfers and he's alone, he's at risk for falling as far as I can see.

Ruhsam testified that a HiRider would minimize the number of transfers Johnson would need to make daily. The evidence indicated that a passive standing device other than a HiRider would require Johnson to transfer between two devices. Ruhsam testified that a HiRider would not be cost-effective for someone with a home care aide because the aide could reposition the person. Ruhsam felt that a HiRider might enable Johnson to continue living independently without assistance from a personal care attendant for a longer period of time than would be possible otherwise.

The chief appeals referee found:

13. [Johnson's] physician and therapist argue that it is the community medical standard to prescribe a health service that reduces the effects of a medical condition—even though it may not eliminate them entirely. Dr. Shapiro prescribed the HiRider for [Johnson], and he did so as an expert in the treatment of multiple sclerosis. Dr. Shapiro has only written two prescriptions in the past eighteen years for stand-up wheelchairs, he asserts. Moreover, the HiRider was recommended by Ronna Linroth, occupational therapists, and Sharon Ruhsam, physical therapist, who treat [Johnson] at the MS Achievement Center.

[Johnson] is the only client out of three hundred, for whom these therapists have recommended a HiRider. They justify the departure in [Johnson's] case, as he is unique from other MS sufferers. He has superior cognitive skills and upper body strength and motor skills, whereas the majority of MS patients have weakened upper extremities and significant cognitive impairment. [Johnson] is young enough and his MS is recent enough, that he is likely to receive long-term benefits from the equipment, assert Ms. Ruhsam and Ms. Linroth.

[Johnson] understands his symptoms and is a safe and effective manager of them, asserts Dr. Shapiro. His therapists testified that if [Johnson] is not provided the HiRider, he will have more falls or slips during transfers and will require some home care services to assist in performing transfers. The provision of the HiRider would clearly avert his need for home care services in the foreseeable future. Passive standing, through the use of the HiRider, will keep [Johnson] in better shape, maximize the function of his bones and muscles and maximize his independence. [Johnson] possesses the arm strength, the cognitive ability and the motivation necessary to maximize the benefits from the HiRider and passive standing. Finally, he is capable of safely and effectively operating and maintaining the HiRider.

14. [Johnson's] treating professionals assert the HiRider is more effective, appropriate and efficient than home care services for [Johnson], as [Johnson] does

not currently have home care services and home care services would not allow him to stand when and where he wanted. Most importantly, the HiRider is more appropriate, efficient and safe than mobile standing devices for [Johnson], as he cannot independently transfer into a mobile stander, cannot safely return to a seated position, if he becomes fatigued while using a mobile stander, and he cannot perform other activities while using a mobile stander.

The chief appeals referee concluded:

> The equipment [Johnson] seeks here is beneficial or useful in a general sense but not medically necessary. It is the most optimal approach to meeting his ambulation and related needs. However, the record suggests a less expensive combination of a standard wheelchair and standing device might adequately address these needs, and [Johnson] has not demonstrated otherwise. Put another way, he has not shown this device is the least expensive appropriate alternative.

### ISSUES

I. Does substantial evidence support the chief appeals referee's determinations that the HiRider was not medically necessary and that Johnson failed to establish the HiRider was the least expensive appropriate alternative?

II. Did the district court err in ordering the issuance of a writ of mandamus requiring the Department to immediately provide authorization for Johnson to obtain a HiRider?

### ANALYSIS

#### I.

■ The district court reviewed the chief appeals referee's decision pursuant to Minn. Stat. § 256.045, subds. 7–8 (Supp.1995). Under that statute, "district courts engage in appellate review of MA eligibility decisions." *In re Kindt,* 542 N.W.2d 391, 398 (Minn.App. 1996). On appeal from the district court's appellate review of an administrative agency's decision, this court does not defer to the district court's review, but instead independently examines the agency's record and de-

termines the propriety of the agency's decision. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977).

"This court's review of a decision of the Commissioner of Human Services is governed by Minn.Stat. § 14.69." *Kaplan v. Washington County Community Soc. Servs.,* 494 N.W.2d 487, 489 (Minn.App.1993). Minn. Stat. § 14.69(e)–(f) (1996) provides that this court may reverse or modify an agency decision if the decision was "[u]nsupported by substantial evidence in view of the entire record as submitted" or "[a]rbitrary or capricious." The party challenging the agency decision has the burden of proving the existence of a statutory ground for reversal. *Erickson v. Commissioner of the Dep't of Human Servs.,* 494 N.W.2d 58, 62 (Minn. App.1992).

■ Prior authorization of a health service covered under the medical assistance program will not be approved unless the health service is "medically necessary as determined by prevailing medical community standards or customary practice and usage" and is "the least expensive appropriate alternative health service available." Minn. R. 9505.5030.A, E (1995); *see also* Minn. R. 9505.0175, subp. 25 (1995) (defining medically necessary). Johnson argues that substantial evidence does not support the chief appeals referee's determinations that Johnson failed to establish that the HiRider is medically necessary and the least expensive appropriate alternative. Substantial evidence is defined as:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than some evidence;
4. More than any evidence; and
5. Evidence considered in its entirety.

*Cable Communications Bd. v. Nor–West Cable Communications Partnership,* 356 N.W.2d 658, 668 (Minn.1984).

*Medically necessary.*

The Department argues that substantial evidence supports the chief appeals referee's

determination that the HiRider was not medically necessary because Johnson failed to prove the HiRider was "recognized as the prevailing standard or current practice by the provider's peer group." Minn. R. 9505.0175, subp. 25.A. The Department does not dispute that passive standing is recognized by the medical community as the prevailing standard or current practice for treating problems caused by prolonged immobility. The Department argues the evidence showed that other types of passive standing devices, such as independent hydraulic or electric standing frames, not combination mobility and standing devices, are recognized as the prevailing standard of practice.

But Johnson presented evidence that he could not safely and effectively use other types of passive standing devices without assistance. Dr. Shapiro testified that to benefit from passive standing, Johnson would need to get into a standing position several times daily. The evidence presented showed that a passive standing device other than a combination standing and mobility device would require Johnson to transfer between two devices. Ruhsam testified that Johnson was having increasing difficulty making transfers and that he was at risk for falling every time he transferred. Linroth testified that it was not safe for Johnson to use an independent standing frame by himself because he could fall if he became fatigued while standing. The HiRider enabled Johnson to move between sitting and standing positions by just touching two buttons. Johnson was still able to live independently, and Linroth believed that the HiRider would be cost-effective given Johnson's age and the fact that intervention was occurring during an early stage in the development of his MS.

The chief appeals referee's findings indicate that he found credible the testimony of Dr. Shapiro, Ruhsam, and Linroth. Their testimony established that passive standing was the prevailing standard or current practice for treating problems caused by prolonged immobility and that the HiRider was the only type of passive standing device Johnson could use safely and effectively while living independently. This evidence established a prima facie case that the HiRider was medically necessary given Johnson's unusual situation in terms of the progression of his MS. Cf. Elk River Concrete Prod. Co. v. American Cas. Co., 268 Minn. 284, 292, 129 N.W.2d 309, 314–15 (1964) (when plaintiff proved that final voucher was not signed by commissioner and that ordinarily a job was not considered accepted until commissioner approved the final voucher, plaintiff established a prima facie case of nonacceptance).

 The general rule in civil cases is that

"[w]here a plaintiff proves a prima facie case and it is unrebutted by defendant, the plaintiff has met his burden of proof."

Kirsebom v. Connelly, 486 N.W.2d 172, 175 (Minn.App.1992) (quoting Fidelity Bank & Trust Co. v. Fitzimons, 261 N.W.2d 586, 590 (Minn.1977)). A prima facie case shifts the burden of going forward with the evidence to the opposing party. Fidelity Bank & Trust, 261 N.W.2d at 590 n. 10. In determining Johnson's eligibility for medical assistance funds to purchase a HiRider, the chief appeals referee essentially was acting in the role of a trial judge. We therefore conclude that the general rule applicable to civil cases also applies to an administrative proceeding to determine a person's eligibility for medical assistance funds for a health service. See In re Northern States Power Co., 416 N.W.2d 719, 722 (Minn.1987) ("[i]n evaluating the validity of a rate increase application, the Commission should apply the classic burden of proof analysis employed in civil cases in determining whether the utility has established the amount of a claimed cost as a judicial fact"); see also Meath v. Harmful Substance Compensation Bd., 550 N.W.2d 275, 280 (Minn.1996) (Anderson, J., concurring specially) (when performing a quasi-judicial function, agency receives evidence to make factual findings and weighs that evidence as would a trial judge).

Citing Ruhsam's testimony that even standing for 15 minutes per day can help Johnson, the Department argues that the HiRider was not medically necessary for Johnson. But Ruhsam also testified that standing more often would be more beneficial, and Dr. Shapiro testified that to benefit

from passive standing, Johnson would need to get into a standing position several times daily. The evidence that standing for 15 minutes can provide some benefit was insufficient to rebut the evidence that Johnson needed to stand more often to benefit from passive standing. The Department also cites evidence that at least one standing frame, the Easy Stand frame, makes it possible for persons to stand for longer periods of time. But the evidence involved a person who did not have MS. Here, evidence indicated that due to fatigue caused by MS, Johnson would not be able to stand for long periods at one time. The Department did not present sufficient evidence to rebut the prima facie case that a HiRider was medically necessary for Johnson.

The Department contends that *In re Lakedale Tel. Co.*, 561 N.W.2d 550 (Minn.App. 1997), should control this case. We disagree. In *Lakedale*, this court rejected Lakedale Telephone's argument that the Minnesota Public Utilities Commission erred in rejecting Lakedale Telephones rate proposal because the only evidence in the record supported Lakedale Telephone's proposal. But in *Lakedale*, the Public Utilities Commission found the evidence presented by Lakedale unpersuasive. Here, in contrast, the chief appeals referee's findings indicate that he found credible the evidence presented by Johnson.

### *Least expensive appropriate alternative.*

The evidence showed that other types of passive standing devices are less expensive than the HiRider. But the evidence showed that because of problems with fatigue and transferring himself, Johnson could not safely and effectively use the less expensive devices by himself. The testimony of Dr. Shapiro, Ruhsam, and Linroth showed that the HiRider was the only known appropriate passive standing device for Johnson. Because no other known device was appropriate, the evidence, which the chief appeals referee's findings indicate he found credible, established a prima facie case that the HiRider was the least expensive appropriate alternative. The Department argues that some other passive standing device might be appropriate for Johnson. But the Department did not present any evidence that identified another appropriate device. Absent evidence that another appropriate device actually exists, the Department did not rebut the prime facie case. The chief appeals referee therefore erred in determining that Johnson failed to establish the HiRider was the least expensive appropriate alternative.

Johnson also argues that the chief appeals referee's decision was arbitrary and capricious. "An agency's determination is arbitrary and capricious when it represents the agency's will and not its judgment." *In re Minn. Power*, 545 N.W.2d 49, 51 (Minn.App. 1996).

> If there is room for two opinions on a matter, the agency's action is not arbitrary or capricious even though the court may believe that an erroneous conclusion has been reached.

*In re Rochester Ambulance Serv.*, 500 N.W.2d 495, 499 (Minn.App.1993). Because the evidence does not support the chief appeals referee's conclusions that Johnson failed to establish that the HiRider was medically necessary and the least expensive appropriate alternative, the chief appeals referee's denial of Johnson's request for prior authorization for medical assistance funds to purchase a HiRider was arbitrary and capricious.

### II.

Johnson filed a petition in district court seeking the issuance of a writ of mandamus compelling the Department to provide authorization for him to obtain a HiRider while the Department's appeal was pending.

> Mandamus is an extraordinary legal remedy awarded, not as a matter of right, but in the exercise of sound judicial discretion and upon equitable principles. A trial court's order on an application for mandamus relief will be reversed on appeal only when there is no evidence reasonably tending to sustain the trial court's findings.

*Coyle v. City of Delano*, 526 N.W.2d 205, 207 (Minn.App.1995).

To obtain a writ of mandamus, a petitioner must meet standing requirements. Minn.Stat. § 586.01–.02 (1992). A petitioner must demonstrate: (1) the failure of an

official duty clearly imposed by law; (2) a public wrong specifically injurious to petitioner; and (3) no other adequate specific legal remedy. Minn.Stat. § 586.02, .04 (1992).

*Id.*

Mandamus will issue only when the petitioner has shown the existence of a legal right to the act demanded which is so clear and complete as not to admit any reasonable controversy. Similarly, mandamus will lie only to compel performance of a duty which the law clearly and positively requires.

*Day v. Wright County,* 391 N.W.2d 32, 34 (Minn.App.1986), *review denied* (Minn. Sept. 24, 1986).

■ Johnson argues that under Minn. Stat. § 256.045, subd. 10 (1996), the Department had a duty to provide authorization for him to obtain a HiRider pending the outcome of this appeal. Minn.Stat. § 256.045, subd. 10, provides:

If the commissioner of human services or district court orders *monthly assistance or aid or services* paid or provided in any proceeding under this section, it shall be paid or provided pending appeal to the commissioner of human services, district court, court of appeals, or supreme court.

(emphasis added).

■ Johnson argues that "monthly" modifies only "assistance" and not "aid or services," and concludes that the statute requires the HiRider to be provided pending appeal. The Department argues that "monthly" modifies "assistance or aid or services" and, therefore, while an appeal is pending, the Department is obligated to pay for only assistance or aid or services provided on a monthly basis. Because a HiRider is provided on a one-time basis, rather than monthly, the Department concludes the HiRider need not be provided pending appeal. Because both interpretations of the statute are reasonable, the statute is ambiguous. *See Tuma v. Commissioner of Econ. Sec.,* 386 N.W.2d 702, 706 (Minn.1986) (statute is ambiguous when it can be given more than one reasonable interpretation).

■ The Department argues that because the statute is ambiguous, it does not clearly impose a duty and mandamus is not available to enforce the statute. But, as Johnson argues, *International Union of Operating Eng'rs v. City of Minneapolis,* 305 Minn. 364, 368–371, 233 N.W.2d 748, 751–53 (1975), indicates that mandamus is available to enforce a duty even when the language of the statute creating the duty is ambiguous. In *International Union,* the supreme court construed statutes imposing a duty on public employers to meet and negotiate with exclusive representatives of public employees regarding employment terms and conditions as requiring the disclosure of particular information even though the statutes did not expressly address the disclosure of information. The court held that mandamus was available to compel disclosure of the information. *Id.* at 375, 233 N.W.2d at 755. Under the procedure followed in *International Union,* we must construe the statute to determine whether it imposes a duty to provide Johnson a HiRider pending appeal.

Statutory construction is a question of law subject to de novo review. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985). The object of statutory construction is to determine and give effect to the legislature's intent. Minn.Stat. § 645.16 (1996). A statute should be construed according to the plain and ordinary meaning of its language, and grammar rules apply when construing a statute. *Heaslip v. Freeman,* 511 N.W.2d 21, 22 (Minn.App.1994), *review denied* (Minn. Feb. 24, 1994). When a statute is ambiguous, the legislature's intent may be determined by considering the occasion and necessity for the law; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other laws upon the same or similar subjects; the consequences of a particular interpretation; the contemporaneous legislative history; and legislative and administrative interpretations of the statute. Minn.Stat. § 645.16.

Under Johnson's construction of Minn. Stat. § 256.045, subd. 10., the Department would not be required to provide a HiRider

pending appeal if a HiRider is assistance, rather than aid or services, because a HiRider is provided on a one-time basis, and, thus, cannot be monthly assistance. Therefore, to reach the result urged by Johnson, we would have to conclude that a HiRider is aid or services, rather than assistance. We see no basis for such a conclusion. We have found no statutory definition of assistance, aid, or services. Absent statutory definitions that indicate whether a particular benefit is assistance, aid, or services, there is no reason to conclude that the HiRider falls within any one of these categories rather than another.

Assistance is defined as aid, help, and the act of assisting. *The American Heritage Dictionary of the English Language* 112 (3d ed.1992). Aid is defined as assistance and the act or result of helping. *Id.* at 37. Service is defined as an act of assistance or benefit to another. *Id.* at 1649. Using these plain and ordinary meanings, we find that the three terms are essentially synonymous. Because the three terms are synonymous, every benefit could be described as assistance, aid, or service, and Johnson's construction of Minn.Stat. § 256.045, subd. 10., would require payment of all benefits pending appeal. Any monthly benefit would be required to be paid pending appeal if the benefit were characterized as assistance, and any one-time benefit would be required to be paid pending appeal if the benefit were characterized as aid or services.

The sole effect of using "monthly" in the statute is to distinguish between benefits that are received monthly and benefits that are not received monthly. If the legislature had intended to require that all benefits be paid pending appeal, it would not have included the modifier "monthly" in the statute at all. We, therefore, conclude that "monthly" modifies "assistance or aid or services." Accordingly, the statute does not impose a duty on the Department to provide authorization for Johnson to obtain a HiRider pending appeal and mandamus does not lie to compel the Department to do so.

### DECISION

The district court properly determined that the chief appeals referee erred in deny-

ing Johnson's request for prior authorization for medical assistance funds to purchase a HiRider. The district court erred in issuing a writ of mandamus compelling the Department to provide Johnson authorization to obtain a HiRider pending appeal.

**Affirmed in part and reversed in part.**