Shaina **SHAGALOW**, Appellant,

v.

**STATE of Minnesota, DEPARTMENT OF HUMAN SERVICES,** Respondent.

No. A06–246.

Court of Appeals of Minnesota.

Dec. 19, 2006.

Corey L. Gordon, Shapiro Gordon, LLC, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, Robin Christopher Vue–Benson, Erika Schneller Sullivan, Assistant Attorneys General, St. Paul, MN, for respondent.

Considered and decided by MINGE, Presiding Judge; LANSING, Judge; and KLAPHAKE, Judge.

## O P I N I O N

MINGE, Judge.

Appellant challenges the decision of respondent Minnesota Department of Human Services (DHS) denying Medical Assistance coverage for habilitation services in Jerusalem, Israel. Appellant claims that there is no habilitation services program appropriate for her condition and compatible with her religious beliefs in Minnesota; that the only residential habilitation program providing suitable services consistent with her beliefs is in Jerusalem, Israel; that rules governing the Medical Assistance program do not preclude payment for these services in Israel; and that denial of payment to the Israeli provider is improper, violates her right to religious freedom under the federal and state constitutions, and violates the Americans with Disabilities Act (ADA). Because we conclude that the state's decision not to pay for these services is not arbitrary and capricious, is not erroneous, was based on religiously neutral reasons, and does not directly affect appellant's religious beliefs or practices, and that granting appellant's request would place an unreasonable burden on the state's administration of its Medical Assistance program, we affirm.

## FACTS

Appellant Shaina Shagalow is a young Jewish Orthodox woman who has been diagnosed with mild mental retardation. She also has a developmental cognitive disorder and attention deficit hyperactivity disorder. Appellant reads at a sixth-grade level and requires assistance with grooming and similar everyday tasks. Appellant is dependent on others to make legal and medical decisions, and her parents are her court-appointed legal guardians.

Appellant attended a private Jewish Orthodox school for girls from the fourth grade through high school. She lived at home while she attended school. As high school graduation approached, her family began searching for habilitation programs for young adults that were also compatible with her Jewish Orthodox faith. Habilitation services assist persons to develop skills to live in society. Minn. R. 9525.1800, subp. 13a (2006). Appellant's family knew that no day program consistent with appellant's Orthodox faith is available in Minnesota. The only residential habilitation program which appellant's parents could identify that adheres to Jewish Orthodox practices including gender segregation, strict observance of the Sabbath, and food preparation and consumption, is one conducted by Midreshet Darkaynu (Darkaynu), located in Jerusalem, Israel. There are no such residential Jewish Orthodox programs in the United States.

Appellant requested that the Hennepin County Children, Family, and Adult Services Department (county) provide financial support for habilitation services at Darkaynu as a part of Minnesota's Medical Assistance program. Medical Assistance is this state's part of the federal Medicaid program. Appellant does not request assistance for the room and board or travel portions of the program, only habilitation services. The county denied appellant's request, and appellant requested review. The denial was upheld by a referee at DHS, and the commissioner of DHS adopted the referee's decision. Appellant sought review of that decision by the Hennepin County District Court. The district court upheld the decision. This appeal follows.

### ISSUES

**I.** Did DHS err in refusing to pay for habilitation services at Darkaynu for appellant?

**II.** Does DHS's refusal to pay for habilitation services for appellant at Darkaynu violate her right to religious freedom secured by the United States Constitution and the Minnesota Constitution?

**III.** Does DHS's refusal to pay for habilitation services for appellant at Darkaynu violate the Americans with Disabilities Act?

### ANALYSIS

■■■ "On appeal from the district court's appellate review of an administrative agency's decision, this court does not defer to the district court's review, but instead independently examines the agency's record and determines the propriety of the agency's decision." *Johnson v. Minn. Dep't of Human Servs.*, 565 N.W.2d 453, 457 (Minn.App.1997). In accordance with the Minnesota Administrative Procedure Act (APA), the reviewing court may "reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative . . . decision" was:

   (a) in violation of constitutional provisions; or

   (b) in excess of the statutory authority or jurisdiction of the agency; or

   (c) made upon unlawful procedure; or

   (d) affected by other error of law; or

   (e) unsupported by substantial evidence in view of the entire record as submitted; or

   (f) arbitrary or capricious.

Minn.Stat. § 14.69 (2004). "Agency decisions are presumed to be correct by reviewing courts. . . ." *In re Hutchinson*, 440 N.W.2d 171, 176 (Minn.App.1989), *review denied* (Minn. Aug. 9, 1989). Moreover, appellate courts generally defer to an agency's expertise. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). The party challenging the agency decision has the burden of proving grounds for reversal. *Markwardt v. State Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn.1977); *Johnson*, 565 N.W.2d at 457.

### I.

### MEDICAL ASSISTANCE COVERAGE

The first issue is whether DHS's decision was improper. Appellant challenges the conclusion of law that Medical Assistance funds may not be used to pay for services provided outside of the United States and claims that DHS and the county had discretion to pay for such services. Although it is not clear whether appellant claims that DHS erred as a matter of law and appellant does not expressly allege that the refusal was arbitrary and capricious, we will initially construe the appeal from that perspective because those are relevant standards for judicial review.

Both parties concede from the outset that there is no federal or state statute or regulation that explicitly prohibits Medical Assistance from paying for services provided outside of the country. Likewise, while Minnesota law permits payment of Medical Assistance to licensed Canadian institutions under some circumstances, Minn.Stat. § 256B.25, subd. 1 (2004), appellant cannot point to any explicit legal provisions *requiring* DHS to pay for habilitation or other services being delivered outside of the United States. Moreover, there is no evidence that other states have authorized their Medicaid programs to pay out-of-country service providers. The federal and state legal framework, largely, does not speak to the question here.

However, that framework and its administration are relevant to our decision.

### A. *Medical Assistance Habilitation Services and the Waiver*

Appellant requests benefits through the Consumer–Directed Community Support (CDCS) portion of Minnesota's Medical Assistance program. Minnesota participates in the federal program by contracting with the Centers for Medicare & Medicaid Services (CMS), the federal agency that administers Medicaid. *See* 42 U.S.C. § 1396a (2000 & Supp.2003).

Appellant points out that Minnesota's CDCS program is operated pursuant to a waiver granted by CMS and argues that the flexibility afforded in the waiver allows for payment of services provided by Darkaynu. CMS is authorized to grant such waivers from the standard Medicaid requirements. 42 U.S.C. § 1396n(b) (2000 & Supp.2003); 42 C.F.R. § 430.25 (2005). Minnesota requested, and was granted a waiver to pay for home and community-based services, including habilitation services, to mentally disabled persons. Minnesota's CDCS program waiver permits beneficiaries to work with a case manager to design a service plan for their unique needs as follows:

> Recipients or their representative hire, fire, manage and direct their support workers....

> Recipients or their representatives have control over the goods and services to be provided through developing the community support plan, selecting vendors, verifying that the service was provided, evaluating the provision of the service, and managing the CDCS budget....

> ....

> The recipient or their representative will direct the development and revision of their community support plan and delivery of the CDCS services.

> ....

> The support plan will also specify provider qualification and training requirements, who is responsible to assure that the qualification and training requirements are met, and whether or not a criminal background study will be required for each service.

State of Minnesota, *Renewal of the Home and Community–Based Service Waiver for People With Mental Retardation or Related Conditions (MR/RC)*, Appendix B–1, 37–39 (Jan. 1, 2003) [hereinafter MR/RC Waiver].

Appellant asserts that the control granted to recipients under the waiver gives the recipient broad discretion to select service providers and that the primary monitor of quality assurance, as well as the health and safety of the services provided, is the recipient, not DHS or the county. We acknowledge that the flexibility of the waiver supports appellant's claim that the county has the discretion to design a program to accommodate her legitimate religious claims. Appellant in effect asserts that in her situation, failure to accommodate her claims is an abuse of discretion or arbitrary and capricious.

■ Although flexible, the CDCS waiver program includes several safeguards to ensure service providers meet health and safety requirements and comply with applicable licensing statutes. In its administration of the Medical Assistance waiver, the state must demonstrate that it will employ necessary safeguards to protect the health and safety of the beneficiaries, as well as the financial integrity of the program. 42 C.F.R. § 441.302(a), (b) (2005). Minnesota law incorporates similar protections. Minn.Stat. §§ 256B.092, subd. 4, .49, subd. 19 (2004). The waivers are not a license to ignore federal standards. If the state does not comply with

the requirements delineated in the approved waiver program, federal law requires termination of the program, or withholding of federal matching funds. 42 U.S.C. § 1396n(f)(1) (2005); 42 C.F.R. § 441.302 (2005).

These licensing and monitoring responsibilities are not limited to services provided inside the United States, and the burden of meeting these responsibilities is relevant to deciding whether the state is obligated to pay for the services at Darkaynu requested by appellant and whether its decision not to do so is arbitrary and capricious.

### B. *Out–of–State Services*

The nature of DHS's authority to pay for services in other states is also relevant to our analysis of appellant's claims for coverage of services outside the United States. The federal regulation governing Medicaid payments for services provided outside the state of residence reads as follows:

(b) *Payment for services.* A State plan must provide that the State will pay for services furnished in another State to the same extent that it would pay for services furnished within its boundaries if the services are furnished to a recipient who is a resident of the State, and any of the following conditions is met:

(1) Medical services are needed because of a medical emergency;

(2) Medical services are needed and the recipient's health would be endangered if he were required to travel to his State of residence;

(3) The State determines, on the basis of medical advice, that the needed medical services, or necessary supplementary resources, are more readily available in the other State;

(4) It is general practice for recipients in a particular locality to use medical resources in another State.

42 C.F.R. § 431.52(b) (2005). Thus, the federal regulation expressly requires Medicaid payments to out-of-state providers in limited circumstances. Arguably, the interpretive canon *expressio unius est exclusio alterius* applies; by expressly providing for out-of-state payments the regulation thereby impliedly excludes payment to out-of-country service providers. *See, e.g., Cairl v. City of St. Paul*, 268 N.W.2d 908, 912–13 (Minn.1978) (applying the canon in the statutory context). Regardless, it is not logical to expect that Minnesota would have a greater obligation to pay for services in Israel than in another state. Under the regulation, such payment would only be required if there was "medical advice, that the ... necessary supplementary resources, are more readily available in the other State." 42 C.F.R. § 431.52(b)(3) (2005). This medical advice test is a higher standard than a claim that the out-of-state services are needed to accommodate a personal preference. It suggests that absent a constitutional mandate, DHS has discretion to deny appellant's request for habilitation services in Israel.

### C. *Olmstead Amendments*

Also relevant to our decision are the so-called Olmstead Amendments. These are policy changes implemented by CMS that affect the way in which states use Medicaid funds for disabled persons. CMS communicated these changes through a series of letters. The language addressing out-of-state services provides:

[A]ny standards applicable to the provision of the service in the State in which the service is furnished must be met, as well as those standards set forth in the approved waiver. If one State were to pay for a service furnished in another,

the provider must be qualified under the standards in the waiver, and the service must also meet any applicable requirements in the State in which it is provided.

Letter from CMS to State Medicaid Directors, *Olmstead Update No: 3, Attachment 3-e* (July 25, 2000), *available at* http://www.cms.hhs.gov/smdl/downloads/smd072500b.pdf. The same directive continues, "[t]he State operating the waiver remains responsible for the assurance of the health and welfare of the beneficiary...." *Id.* Oversight can be performed by the home state or the host state in which services are provided. *Id.* However, if oversight is provided by the host state, the policy requires that there be "an interstate compact or agreement setting forth the responsibilities of each party." *Id.*

These CMS policy changes are relevant to appellant's request for two reasons. First, by only addressing services furnished in other states, the Olmstead Amendments imply that the waiver program was not intended to fund out-of-country services. Second, the policy reflects the host state's (Minnesota's) continuing obligation to monitor the provision of services, another factor that makes it less likely the program was designed to extend funding for services provided outside the United States where such monitoring is a greater challenge.

### D. *Medicare*

Medicare is the federal insurance based health care program that is also administered by CMS and is a companion program to Medicaid. Although federal law governing Medicare does not bind Minnesota's use of Medicaid funding, it is relevant that with a few limited exceptions (which do not apply to the case before us), federal law explicitly prohibits Medicare from paying for services outside of the United States. *See* 42 C.F.R. § 411.9 (2005). To allow greater flexibility for Medical Assistance than Medicare is illogical. This comparison supports DHS's position that it will not pay for services for appellant in Israel.

### E. *Minnesota Law*

Independent of federal requirements, Minnesota law requires that residential programs offering "24–hour–a–day care, supervision, food, lodging, ... habilitation" be licensed by the state of Minnesota. Minn.Stat. §§ 245A.02, subd. 14, .03, subd. 1 (2004). Darkaynu is a residential program that provides twenty-four hour care, supervision, food, lodging, and habilitation services, and if it were located in Minnesota, state law would require its licensure. Minnesota law also provides that Medical Assistance payments may not be made "for care in any private or public institution, including but not limited to hospitals and nursing homes, unless licensed by an appropriate licensing authority of this state, any other state, or a Canadian province...." Minn.Stat. § 256B.25, subd. 1 (2004). This licensing requirement supports DHS's legal conclusion that Darkaynu would have to be licensed for payment to be made. Appellant claims that qualified American professionals regularly travel to Israel and can inspect Darkaynu and certify that it meets all relevant standards. Appellant asserts that her parents or members of the Jewish Orthodox community can arrange for such inspections. However, the awkwardness and informality of such a surrogate arrangement confirms that DHS is not required to pay for services at Darkaynu and that its refusal to do so is not arbitrary and capricious.

### F. *Conclusion*

As previously noted, the flexibility allowed under the Medical Assistance waiver

agreement gives DHS discretion to approve appellant's provider. However, DHS's discretion is not without limit. The waiver does not vest appellant with the authority to approve her own service plan. That is the role of the county and ultimately, DHS. Furthermore, when one views the waiver in the context of the Medicaid program and the various federal and state laws, regulations, and policy directives, it is questionable whether DHS is authorized to pay for services at a distant facility in Israel. DHS oversight is required to ensure the quality, safety, and financial integrity of waiver services and is emphasized in federal law, 42 U.S.C. § 1396n(f)(1) (2000); federal CMS regulations, 42 C.F.R. § 441.302(a), (b) (2005); the CMS Olmstead policy directives; state law requiring licensure of residential habilitation service providers, Minn.Stat. § 245A.03, subd. 1; and the text of the waiver itself. MR/RC Waiver, Appendix B–1, 42–43. Despite appellant's arguments, we conclude that the DHS determination that it does not have such authority is a reasonable exercise of its discretion in interpreting the law under which it operates. Given DHS's expertise in administering its program, this determination is entitled to respect by this court. We conclude that DHS's decision, denying payment for habilitation services for appellant at Darkaynu, is not an abuse of its discretion, is not in violation of the waiver or of law, and is not arbitrary and capricious.

## II.

### CONSTITUTIONAL CLAIMS

A. *United States Constitution*

■ The next issue is whether refusal by DHS to pay for habilitation services for appellant at Darkaynu violates appellant's right to religious freedom under the United States Constitution. The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. The religion clauses apply to the states by incorporation into the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

■ Federal cases interpreting the religion clauses establish that neutral laws of general applicability do not run afoul of the First Amendment, even if they incidentally burden an individual's religious conduct. *Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990). Such neutral, generally applicable laws "need not be justified by a compelling governmental interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993). But a law that is not neutral or generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest," even if it only incidentally burdens an individual's free exercise. *Id.*

Appellant challenges DHS's refusal to pay for a specific habilitation program. Because of the discretion inherent in DHS's decision, appellant argues that we should analyze this case under the framework established in the unemployment compensation line of cases represented by *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In those cases, "developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct," the Court applied strict scrutiny and struck down neutral and generally applicable unemployment compensation rules that conditioned benefits on an appli-

cant's willingness to work on Saturdays. *Smith,* 494 U.S. at 884, 110 S.Ct. at 1603.

We recognize that the strict scrutiny analysis in the unemployment line of cases was not expressly overruled by *Smith,* and that federal circuit courts have used an individualized assessment approach as an exception to *Smith. See, e.g., Axson–Flynn v. Johnson,* 356 F.3d 1277, 1297–99 (10th Cir.2004); *Swanson v. Guthrie Indep. Sch. Dist. No. 1–L,* 135 F.3d 694 (10th Cir.1998). We do not disagree with such applications of an individual assessment, but we decline appellant's invitation to extend it to her situation. *See Smith,* 494 U.S. at 883, 110 S.Ct. at 1602 ("We have never invalidated any governmental action on the basis of the *Sherbert* test except the denial of unemployment compensation."). Instead, we continue to apply the test established in *Smith.*

Here, in accordance with *Smith,* DHS's decision was religiously neutral. DHS's action was not motivated by a desire to harm, restrict, or burden appellant's exercise of her religious faith. The decision was neither related to nor did it proscribe appellant's practice of her Orthodox Jewish faith. Rather, the basis for DHS's decision was to permit effective monitoring of the quality, health, and financial integrity of waiver services, irrespective of appellant's exercise of religion. This rationale is not a pretext to conceal religious discrimination or religious animus.[1] In fact, appellant's alternative CDCS budget was fully approved.[2]

The record on appeal is not developed with respect to the general applicability of DHS's decision. Appellant does not claim that the county or DHS has approved similar out-of-country requests for members of any other religious group or for anyone regardless of religion. Without more evidence, we cannot conclude that DHS's decision was either an under- or over-inclusive means to advance its interest in effectively monitoring the provision of waiver services.

We conclude that DHS's decision was neutral and generally applicable and does not violate the United States Constitution.

### B. *Minnesota Constitution*

The next issue is whether DHS's decision violated appellant's right to religious freedom guaranteed by the Minnesota Constitution. The Freedom of Conscience Clause of the Minnesota Constitution states:

> The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify

---

1. The state's recent addendum to its federally approved waiver program, which expressly prohibits funding for waiver services out-of-country and binds the agency's future operation for all beneficiaries irrespective of religious practice, is further evidence of the decision's neutrality. Amendment to MR/RC Waiver, 3 (effective Apr. 1, 2005).

2. While appellant asserts the plan is inadequate, appellant developed an alternative plan for Medical Assistance support for services for the 2004–2005 year. The alternative plan includes payment for day and evening staff, an eight-week summer camp, music lessons, and adaptive sports lessons. The cost of the requested services is $27,623.20 and was approved by the county.

practices inconsistent with the peace or safety of the state. . . .

Minn. Const. art. I, § 16.

■ We have said that "[t]he language of the Minnesota Constitution regarding religion is of a distinctively stronger character than the federal counterpart and precludes even an infringement on or an interference with religious freedom." *Olson v. First Church of Nazarene,* 661 N.W.2d 254, 260–61 (Minn.App.2003) (quotation omitted). To determine whether government action violates an individual's right to religious freedom we ask: (1) whether the belief is sincerely held; (2) whether the state action burdens the exercise of religious beliefs; (3) whether the state interest is overriding or compelling; and (4) whether the state uses the least restrictive means. *Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch.,* 487 N.W.2d 857, 865 (1992); *State v. Hershberger,* 444 N.W.2d 282, 285, 289 (Minn.1989). Appellant has the burden under the second prong of this test to show that the government's action burdens her exercise of religious beliefs, and then the burden shifts to the state to justify its interest as compelling and show that it has chosen the least restrictive means by which to achieve its goal. *See Hill–Murray,* 487 N.W.2d at 866 ("Hill–Murray . . . [has] not established that [the state's action] excessively burdens their religious beliefs.").

■ In this case, the sincerity of appellant's religious belief is not disputed. But the second and fourth prongs of the test are disputed. Accordingly, we begin by determining whether DHS's refusal to fund appellant's request sufficiently burdens appellant's free exercise of her religion. Several cases applying the test guide our determination.

In *Hershberger,* the Minnesota Supreme Court determined whether a state traffic law "requir[ing] slow-moving vehicles to display a fluorescent . . . triangular sign" when moving on public highways violated Amish petitioners' rights to religious freedom. 444 N.W.2d at 284. The law at issue in *Hershberger* directly proscribed the petitioners' protected religious conduct. The court held that "[w]ithout question," application of the statute burdened the petitioners' free exercise by forcing them to choose between criminal sanctions and violating their sincerely held religious beliefs. *Id.* at 287. The *Hershberger* court emphasized, in particular, the potential for jail time and punitive fines under the statute. *Id.*

In *Murphy v. Murphy,* this court evaluated a state child support policy that imputed income to a father who, as part of his sincerely held religious belief, lived and worked exclusively in a religious community. 574 N.W.2d 77, 79 (Minn.App.1998). We held that this application of the child support statute burdened the father's free exercise of religion under the state constitution. *Id.* at 81. We reasoned that "ordering Murphy to pay a support obligation that he [would] be unable to pay without taking a secular job" would burden his free exercise of religion "or cause him to risk penalties for nonpayment of support." *Id.* In *Murphy,* like in *Hershberger,* the court found the weighty sanction for adherence to Murphy's religious beliefs coercive enough to constitute a burden under the second prong of the test. *Id.*

But in *Hill–Murray,* the supreme court held that application of the Minnesota Labor Relations Act (MLRA) to Hill–Murray, a parochial high school, did not violate the Minnesota Constitution. 487 N.W.2d at 864–67. The court found no constitutional infirmity, in part, because the "minimal interference" caused by application of the statute did not "excessively burden[ ] [Hill–Murray's] religious beliefs." *Id.* at 866. The court said that any potential for

significant interference with the school's religious autonomy was remote. *Id.* And the court did not find the potential for increased cost to the school sufficient to constitute an excessive burden on the school's exercise of religion. *See id.* at 868 (Coyne, J., dissenting).

In contrast to cases in which we have found a burden on free exercise, DHS's action here does not force appellant to choose between criminal sanctions and her free exercise of religion. DHS's decision does not penalize her by reducing her CDCS benefits; appellant has been approved for full CDCS benefits under her alternative plan. The decision does not prohibit her exercise of religion. DHS's refusal to authorize funding for services provided in Israel does make appellant's attendance at Darkaynu more expensive, but does not directly infringe on her religious autonomy or require conduct inconsistent with her religious beliefs. The indirect effect on religion is not motivated by an intent to affect religious practices and is not unique to religion.

■ To the extent DHS's action is a burden on appellant's free exercise of religion, DHS claims that its action is justified by a compelling government interest and is narrowly tailored to meet that interest. The state has a legitimate and substantial interest in monitoring social service programs to ensure the health and safety of vulnerable program recipients. In other Minnesota cases we have recognized that the government has a compelling interest in ensuring safety on public roadways, *State v. Hershberger,* 462 N.W.2d 393, 398 (Minn.1990), "assuring parents provide primary support for their children," *Murphy,* 574 N.W.2d at 82, "ensur[ing] the peace and safety of labor relations," and safeguarding employees' rights to collectively organize, *Hill–Murray,* 487 N.W.2d at 866–67. The state's interest in protecting

mentally or physically vulnerable persons is no less important and no less compelling. *See* Minn.Stat. § 626.557, subd. 1 (2004) ("The legislature declares that the public policy of this state is to protect adults who, because of physical or mental disability or dependency on institutional services, are particularly vulnerable to maltreatment. . . .").

■ Finally, we consider the fourth prong of the test: whether the state is using the least restrictive means to accomplish its objective. DHS's decision not to fund services in Jerusalem is based on its obligation to monitor the quality of waiver services, to ensure services are provided in a safe and healthy environment, and to investigate reports related to the vulnerability of recipients or misuse of public funds. Appellant argues that there is no requirement that state employees make on-site visits to service providers, that the monitoring function can be performed by a visiting credentialed volunteer identified by her family, and that this monitoring function can be narrowly designed to accommodate appellant's religious beliefs and still satisfy DHS's obligations. Appellant also argues that her parents have a strong interest in her welfare, will communicate with and visit appellant in Israel, and that this family monitoring would further satisfy DHS's requirements to provide quality assurance. While we do not question the sincerity of appellant's representations, we do not find the argument persuasive. The terms of Minnesota's waiver give DHS and the county substantial discretion in determining how best to monitor and investigate the provision of services in the interest of recipients' safety and health and the financial integrity of the program. Because DHS is in the best position to determine the least restrictive means by which to effectively achieve its

goal, DHS's position is entitled to deference.

A judicial determination that as a matter of constitutional law DHS is required to undertake the individualized program appellant urges would create untold complexities. Others seeking benefits at remote locations would claim discrimination if their requests were rejected. Of necessity, DHS would become involved with evaluating the character of the parents, programs in distant parts of the world, and ad hoc monitoring arrangements. Stating appellant's dramatic demand reveals its weakness: unless DHS pays for enrollment in a faith-based program in Israel, it violates her religious freedom. The location is the subject of recurring military conflict half way around the world. If the state must make this accommodation, it is hard to imagine an accommodation that would not be constitutionally mandated. We conclude that DHS's decision did not violate appellant's rights under the Minnesota Constitution.

## III.

### AMERICANS WITH DISABILITIES ACT

The final issue is whether DHS's decision violated Title II of the Americans with Disabilities Act (ADA). Title II of the ADA states, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2000).[3] In *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 603 n. 14, 119 S.Ct. 2176, 2188 n. 14, 144 L.Ed.2d 540 (1999), the Supreme Court interpreted this language and held that the ADA does not require the provi-

sion of a particular level of benefits and only requires states to "adhere to the ADA's nondiscrimination requirement *with regard to the services they in fact provide.*" *Id.* (emphasis added).

██  Under *Olmstead,* this situation presents no ADA violation because appellant has not demonstrated that the agency has denied appellant benefits they regularly provide, or that appellant was denied services on account of her disability. Instead, DHS's full approval of appellant's alternative budget, DHS's legitimate concern with its monitoring the provision of services in Israel, and the subsequent amendment to the waiver program formally prohibiting funding of services provided outside of the country, all indicate that appellant's disability was not the reason her request was denied. Accordingly, we conclude appellant does not have a claim under Title II and that DHS's decision to deny appellant's request did not violate the ADA.

## DECISION

We affirm the decision of the district court and hold that DHS did not err or abuse its discretion and did not violate the United States or Minnesota constitutions, or the ADA by refusing to provide coverage in the Medical Assistance program for habilitation services for appellant at Midreshet Darkaynu in Jerusalem, Israel.

**Affirmed.**

---

**3.** *See also* Minn.Stat. § 363A.12, subd. 1    (2004).