ACCEPTED
03-15-00325-CV
7295935
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/8/2015 3:39:28 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00325-CV**

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/8/2015 3:39:28 PM
JEFFREY D. KYLE
Clerk

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

JESSICA LUKEFAHR,

*Appellee.*

_____

On Appeal From
The 345th Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-002158
The Honorable Judge Stephen Yelenosky

_____

**BRIEF OF APPELLEE**
_____

MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
T: 512.458.5800
F: 512.458.5850
moconnell458@gmail.com

*Attorney for Appellee*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ....................................................................................... ii

ISSUE PRESENTED ...................................................................................................vi

LEGAL FRAMEWORK OF THE MEDICAID PROGRAM ....................................2

STATEMENT OF FACTS ...........................................................................................5

SUMMARY OF ARGUMENT ..................................................................................14

ARGUMENT ..............................................................................................................16

    I. The District Court Correctly Determined that Jessica Lukefahr is Entitled to Medicaid Authorization of a Custom Power Wheelchair with Integrated Standing Feature because HHSC's Administrative Decision Denying this Durable Medical Equipment is Unsupported by Substantial Evidence and is Arbitrary and Capricious..................................................16

        A. HHSC Failed to Meet its Burden of Proof at the Fair Hearing.....................................................................................17

        B. The Hearing Officer's Findings of Fact Do Not Support HHSC's Final Decision ..............................................................30

    II. HHSC's Administrative Review Does Not Comport with Agency Requirements..................................................................35

CONCLUSION AND PRAYER ..................................................................................37

CERTIFICATE OF COMPLIANCE ...........................................................................38

CERTIFICATE OF SERVICE ....................................................................................39

# TABLE OF AUTHORITIES

## CASES

*Beal v. Doe*,
 432 U.S. 438 (1977)..............................................................................29

*City of El Paso v. Public Util. Comm'n of Texas*,
 883 S.W.2d 179 (Tex. 1994) ...............................................................35

*City of Waco v. Texas Comm'n on Envtl. Quality*,
 346 S.W.3d 781 (Tex. App.—Austin 2011, pet. denied) ...................35

*DeSario v. Thomas*,
 139 F.3d 80 (2d Cir. 1998) ....................................................................3

*Goldberg v. Kelly*,
 397 U.S. 254 (1970)..............................................................................18

*Gray Panthers v. Schweiker*,
 652 F. 2d 146 (D.C. Cir. 1980)............................................................18

*Heritage on San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl.
Quality*, 393 S.W.3d 417 (Tex. App. 2012)............................................35

*Johnson v. Minn. Dept. of Human Serv.*,
 565 N.W.2d 453 (Minn. App. 1997) ...................................................28

*Kessler v. Blum*,
 591 F. Supp. 1013 (S.D.N.Y. 1984) ......................................................4

*Ladd v. Thomas*,
 14 F. Supp. 2d 222 (D. Conn. 1998)......................................................4

*McMahon v. Minter*,
 No. 3251 (Sup.Ct. Mass., Feb. 24, 1975) ..............................................4

*Moore v. Reese*,
 637 F.3d 1220 (11th Cir. 2011) ...........................................................29

*Pinneke v. Preisser,*
   623 F.2d 546 (8th Cir. 1980) ...................................................................28

*Shakhnes v. Berlin,*
   689 F.3d 244 (2d Cir. 2012) ...................................................................36

*Shakhnes ex rel. Shakhnes v. Eggleston,*
   740 F. Supp.2d 602 (S.D.N.Y. 2010) ......................................................36

*Slekis v. Thomas,*
   525 U.S. 1098 (1999)................................................................................3

*Starr Cnty. v. Starr Indus. Servs., Inc.,*
   584 S.W.2d 352 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.).....................37

*Texas Health Facilities Comm'n v. Charter Med.-Dalles, Inc.,*
   665 S.W.2d 446 (Tex. 1984) ...................................................................30

*Texas Medical Assn. v. Mathews,*
   408 F. Supp. 303 (W.D. Tex. 1976) .........................................................37

*Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n,*
   910 S.W.2d 147 (Tex. App. 1995)............................................................30

*Weaver v. Reagan,*
   886 F. 2d 194 (8th Cir. 1989) .................................................................27

*Wilder v. Virginia Hospital Association,*
   496 U.S. 498 (1990)..................................................................................2

## REGULATIONS

1 TEX. ADMIN. CODE § 354.1031(b)(12)......................................................4

1 TEX. ADMIN. CODE § 354.1039(a)(4)(D) .............................................4, 10, 15, 17

1 TEX. ADMIN. CODE § 354.1040 ..............................................................16

1 TEX. ADMIN. CODE § 354.1040(b)(3).........................................................5

1 TEX. ADMIN. CODE § 354.1040(c)(1-4) ........................................................20

1 TEX. ADMIN. CODE § 357.9 .....................................................................10, 17

1 TEX. ADMIN. CODE § 357.23(a) .....................................................................10

1 TEX. ADMIN. CODE § 357.703 ........................................................................14

1 TEX. ADMIN. CODE § 357.703(b)(3).................................................................36

42 C.F.R. § 431.10(e)(1) .....................................................................................3

42 C.F.R. § 431.210(b) ......................................................................................18

42 C.F.R. § 431.210(c).......................................................................................18

42 C.F.R. § 431.244(f) .......................................................................................36

42 C.F.R. § 435.930 .............................................................................................4

42 C.F.R. § 440.70(b)(3)......................................................................................3

42 C.F.R. § 440.230(b) ........................................................................................3

42 C.F.R. § 440.230(c).........................................................................................3

## STATUTES

42 U.S.C. § 1396...................................................................................................2

42 U.S.C. § 1396a(a)(3)......................................................................................18

42 U.S.C. § 1396a(a)(5).......................................................................................2

42 U.S.C. § 1396a(a)(8).......................................................................................4

42 U.S.C. § 1396a(a)(17).....................................................................................3

42 U.S.C. § 1396d(a)(7) ..................................................................3

42 U.S.C. § 1396w2 .......................................................................2

42 U.S.C. § 1396-1 .........................................................................2

TEX. GOV'T CODE § 531.019(c) ......................................................2

TEX. GOV'T CODE § 531.021(a) ......................................................2

TEX. GOV'T CODE § 2001.171 .........................................................2

TEX. GOV'T CODE § 2001.174(2) ...................................................16

TEX. GOV'T CODE § 2001.174(2)(E) ..............................................30

TEX. HUM. RES. CODE § 32.0425 ..................................................16

TEX. HUM. RES. CODE § 32.0425(a)(1) ...........................................5

## OTHER AUTHORITIES

RESNA Position on the Application of Wheelchair Standing Devices, *Assistive Technology*, 2009 ...................................................................26

Sprigle S., Mauer C., Sorenblum S. *Load Distribution in Variable Position Wheelchairs in People with Spinal Cord Injury*. Journal of Spinal Cord Medicine, February 2010 ...................................................25

TMPPM DME Handbook §2.2.2 .........................................................4

2013 TMPPM DME Handbook §2.2.15.26 ..........................................16

# ISSUE PRESENTED

Whether the district court correctly determined that Jessica Lukefahr is entitled to Medicaid authorization of a custom power wheelchair with integrated standing feature because HHSC's administrative decision denying this durable medical equipment is unsupported by substantial evidence and is arbitrary and capricious?

No. 03-15-00325-CV

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

JESSICA LUKEFAHR,

*Appellee.*

_____

On Appeal From
The 345th Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-002158
The Honorable Judge Stephen Yelenosky

_____

**BRIEF OF APPELLEE**

_____

To the Honorable Third Court of Appeals:

This appeal arises out of a Medicaid hearing decision issued by the Texas Health and Human Services Commission (HHSC) denying Jessica Lukefahr's request for Medicaid prior authorization of a custom power wheelchair with integrated standing feature. HHSC App. B and C.[1] Ms. Lukefahr filed a Petition for Judicial Review in the Travis County District Court to challenge this denial.

---

[1] Citations to the record are shown as: Court Record (CR) plus page number; Administrative Record (AR) plus page number; Hearing Recording (HR) plus time notations when testimony occurs; or Appendix (App.) plus page number, where applicable.

1

pursuant to TEX. GOV'T CODE §§ 531.019(c) and 2001.171 *et seq.* CR 3-37. The trial court correctly reversed the agency's decision, finding that "THHSC violated the due process rights of Ms. Lukefahr and the decision denying Plaintiff a custom power wheelchair with integrated standing feature is not supported by substantial evidence and is arbitrary and capricious." CR 226; HHSC App. A. The trial court's decision should be affirmed.

## LEGAL FRAMEWORK OF THE MEDICAID PROGRAM

In 1965, Congress enacted Title XIX of the Social Security Act to establish Medicaid, a federal-state program designed to provide medically necessary health care to low income families and individuals with disabilities. 42 U.S.C. §§ 1396-1396w2. The purpose of the Medicaid program is to enable states "to furnish…rehabilitation and other services to help such families and individuals attain or retain the capability for independence or self-care." 42 U.S.C. § 1396-1. State participation in Medicaid is optional, however, "once a state chooses to join, it must follow the requirements set forth in the Medicaid Act and its implementing regulations." *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 502 (1990).

The Centers for Medicare and Medicaid Services (CMS) provide federal oversight of state Medicaid programs; however, each state must designate a single state agency to administer its Medicaid program. 42 U.S.C. § 1396a(a)(5). HHSC is the designated Medicaid agency in Texas. TEX. GOV'T CODE § 531.021(a). As

such, HHSC must comply with all federal Medicaid requirements when promulgating rules or establishing policy and cannot delegate its authority on program matters to its contracted entities. 42 C.F.R. § 431.10(e)(1). These contracted entities, including the Texas Medicaid and Healthcare Partnership (TMHP), must comply with all Medicaid requirements when approving or denying health care services requested by eligible beneficiaries.

At issue in this case is the medical equipment benefit, a required component of Medicaid's home health category of service. 42 U.S.C. § 1396d(a)(7); 42 C.F.R. § 440.70(b)(3). While federal law does not presently define the term durable medical equipment (DME), the Health Care Financing Administration (now CMS) has issued official guidance concerning this mandatory Medicaid benefit. HHSC App. H. Known as the *DeSario* Letter, this 1998 guidance clarified that state Medicaid programs must comply with the Medicaid Act's reasonable standards requirement, 42 U.S.C. § 1396a(a)(17), and amount duration, and scope rule, 42 C.F.R. § 440.230(b-c), in administering their DME benefit.[2] To do so, states must establish a reasonable and meaningful procedure within the DME request and appeal process for beneficiaries to seek exceptions to a State's pre-approved list of

---

[2] This policy guidance was issued in response to the Second Circuit's erroneous decision in *DeSario v. Thomas*, which upheld Connecticut Medicaid's categorical exclusions of certain items of DME. The Supreme Court vacated this decision stating: "[P]etition for certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Second Circuit *for further consideration in light of the interpretive guidance issued by the Health Care Financing Administration on September 4, 1998.*" (emphasis added). *Slekis v. Thomas*, 525 U.S. 1098 (1999), *vacating and remanding*, *DeSario v. Thomas*, 139 F.3d 80 (2d Cir. 1998).

DME. This process must: (1) allow for individualized coverage decisions in accordance with the state's DME definition; (2) be timely and employ reasonable and specific criteria by which an individual item of [DME] will be judged for coverage under the home health services benefit; (3) be available to beneficiaries and the public; and (4) include a fair hearing process that determines whether a denial of DME is contrary to federal Medicaid requirements.

In 2013, CMS reaffirmed the continuing application of this federal policy when it wrote to HHSC's Medicaid Director to explain that Texas Medicaid must provide DME when the requested item: (1) is a covered benefit; and (2) is medically necessary for the individual requesting it. Lukefahr App. A; AR 515-516. Once these criteria - coverage[3] and medical necessity[4] - are met by an eligible beneficiary, HHSC or its contracted entity must prior authorize the requested item of DME with reasonable promptness.[5] 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930.

---

[3] Medical equipment is covered by Medicaid if the item meets HHSC's DME definitions. 1 TEX. ADMIN. CODE § 354.1031(b)(12), AR 523-524; TMPPM DME Handbook 2.2.2., AR 525-528.

[4] DME is medically necessary when "required to correct or ameliorate the individual's disability, medical condition, or illness,"or in exceptional circumstances, found to "serve a specific medical purpose." TMPPM DME Handbook 2.2.2, AR 525. 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D). HHSC App. D.

[5] Several courts have established "reasonable" timeframes for Medicaid prior authorization procedures. *See Ladd v. Thomas,* 14 F. Supp. 2d 222, 225 (D. Conn. 1998) (approving 20 working days for DME prior authorization determinations); *Kessler v. Blum*, 591 F.Supp. 1013, 1031–32 (S.D.N.Y.1984) (imposing 21 day time limit); *McMahon v. Minter*, No. 3251 (Sup.Ct. Mass., Feb. 24, 1975) (approving consent decree establishing 15 day limit).

4

**STATEMENT OF FACTS**

Jessica Lukefahr was born with cerebral palsy and has spastic quadriplegia with dystonia. AR 76; 82-89; 109-115; 571; 588, HHSC App. B, FOF No. 1. She is 28 years old and lives on her own. She requires a custom power wheelchair for all mobility and receives physical assistance with activities of daily living from care providers several hours per day. AR 82; 571; 588, HHSC App. B, FOF No. 1.

In January 2013, Jessica was evaluated for a new custom power wheelchair as her current chair is old and in disrepair.[6] This assessment and supporting documentation provided extensive information concerning Jessica's physical disability and the medical conditions she experiences as a result. AR 76; 79; 82-89; 109-115. As explained, Jessica suffers from dystonia, a neurological condition causing involuntary muscle contractions that result in ongoing back and lower leg pain. She has osteopenia and is at increased risk for further loss of bone density due to her lack of weight-bearing. Her respiratory system is compromised and she experiences chronic constipation and urinary tract infections. Jessica is at increased risk for pressure sores due to prolonged sitting in her wheelchair each day. This

---

[6] Jessica's wheelchair assessment was conducted by Michele Hays, PT and David Russell, ATP. Ms. Hays has been licensed to practice physical therapy in Texas for 30 years and is specifically certified to work with individuals who have cerebral palsy. HR 3:21:17-3:21:19; HR 3:22:09-3:22:23. Mr. Russell is a certified Assistive Technology Professional (ATP) and a Qualified Rehabilitation Professional (QRP), as defined in TEX. HUM. RES. CODE § 32.0425(a)(1) and 1 TEX. ADMIN. CODE § 354.1040(b)(3). HR 6:15-6:48 (second day).

prolonged sitting also exacerbates her severe dysmenorrhea and menorrhagia, causing excessive bleeding and blood clots during menstruation.

Jessica's health care providers recommended she receive a custom power wheelchair with integrated standing feature to:

> allow[ ] weight bearing multiple times a day, which is essential to reducing osteoporosis, reducing the risk of joint contractures, facilitating normal bone growth and joint development…removes pressure from the scapulae, sacrum, coccyx, and ischial tuberosities [and] assists with digestion, respiration, and bowel/bladder management.

AR 82-89; 110. Her treating physician approved this evaluation and twice attested to her medical need for a power wheelchair with integrated standing feature. AR 79-80; 377-378.

On March 18, 2013, Jessica's DME supplier initiated HHSC's DME request process by submitting Jessica's prior authorization request to TMHP.[7] AR 376-399; 571; 588, FOF No. 2. TMHP denied this request on March 21, 2013, claiming that "Texas Medicaid does not cover mobile standers." AR 571 and 588, FOF No. 4; AR 367-372; AR 367-369. TMHP did not consider whether the requested wheelchair was medically necessary for Jessica, but instead, informed Jessica's DME supplier this denial could be "appealed for exceptional circumstances." AR 55, Note 03/21/2013; 374-375. That same day, the supplier

---

[7] HHSC's two-step DME request process took more than six months to complete in Jessica's case.

6

asked TMHP to reconsider this denial because TMHP had approved the same wheelchair as a covered home health benefit for other clients. AR 364. HR 9:31-10:00; 11:03-11:18(second day). In response, TMHP claimed that no DME request form had been submitted and requested a copy of this document. AR 362. Although this form had been submitted to TMHP on March 18th, AR 376-378, the DME supplier resubmitted the entire prior authorization request on March 25, 2013, with a statement explaining why TMHP's earlier denial was incorrect. AR 336-361. Despite TMHP's request for resubmission of these documents, they returned them on March 28, 2013, stating "TMHP considers this submission a duplicate request." AR 309.

On April 16, 2013, the DME supplier again wrote to TMHP explaining this was not a duplicate request and their claim that "Medicaid does not offer funding for standing power wheelchairs" was contradicted by previous authorizations he had received for this same wheelchair. AR 277. Additional information from the physical therapist supporting Jessica's medical and functional need for the recommended wheelchair was also provided. AR 288-293. TMHP responded on April 19, 2013, and repeated their claim that this submission was a duplicate request. AR 242.

Jessica's DME supplier filed an exceptional circumstances appeal on June 3, 2013, and submitted all requested documentation, including an addendum to the

initial letter of medical necessity explaining in detail the reasons a custom power wheelchair with standing feature was recommended for Jessica. This explanation included Jessica's diagnoses and current functional status, the secondary medical conditions she faces as a result of prolonged sitting in her wheelchair each day, her medical need to stand multiple times each day at home and in the community, and the underlying rationale for ruling out alternative items of DME. AR 174-207; 208-241; 571; 589, HHSC App. B., FOF No. 7. Specifically, Jessica's physical therapist and physician explained why Jessica cannot use a separate stander to address her medical and functional need to stand. AR 145, ¶2-4.

TMHP returned Jessica's exceptional circumstances appeal on June 6, 2013, claiming they had not received all required information. AR 173. The DME supplier agreed to resubmit the documentation previously provided to TMHP and did so on June 13, 2013. AR 120-172. On June 18, 2013, TMHP voided the appeal, informing the DME supplier that Jessica's request form was now more than 90 days old and could not be processed until a new form was provided. AR 55, Note #2, 06/18/2013. On June 27, 2013, the DME supplier submitted Jessica's exceptional circumstances appeal to TMHP for a third time. AR 71-126. TMHP confirmed that all information had been received and was "in review" on July 2, 2013. AR 69-70.

On July 5, 2013, a pediatrician working for TMHP recommended that HHSC deny Jessica's wheelchair request. AR 56, Note #1, 07/05/2013. More than six weeks passed before TMHP forwarded this appeal to HHSC's Office of Medical Director (OMD) for a final determination of Jessica's eligibility for the recommended wheelchair.[8] AR 483-484. HHSC denied the appeal on September 11, 2013, and subsequently notified TMHP of this decision. AR 491-493.

On September 12, 2013, TMHP issued a second denial notice and identified four reasons for this adverse action. HHSC App. F, AR 58-60; 66-67; 571; 589; HHSC App. B, FOF No. 10. First, TMHP claimed that "the main reason for requesting a standing power was not for treatment of your medical condition" . . . the "main reason for requesting a standing power wheelchair was to help you progress at work." Next, TMHP asserted that the "papers did not show you can tolerate standing for longer periods of time, which limits your ability to benefit from a standing program." TMHP then claimed the "papers did not show you can perform tasks over and over again using your arms against gravity." Finally, TMHP maintained that "the papers did not state why a static stander that you could transfer into and out of would not meet your medical needs." AR 59 ¶ 4. The notice further stated that "[b]ecause the standing feature on the power wheelchair would not serve a specific medical purpose for you, it could not be approved under

---

[8] Jessica's attorney wrote to HHSC on September 3, 2013, to inquire about the status of her exceptional circumstances appeal. AR 485-486. HHSC denied the appeal shortly thereafter.

the exceptional circumstances provision of 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D)." AR 59 ¶5.

Jessica requested a Medicaid fair hearing on September 20, 2013, and waited nearly six months for the hearing to be held.[9] At the hearing, HHSC offered the testimony of two nurses.[10] The first witness, Donna Claeys, is an HHSC employee who did not deny Jessica's wheelchair request, but who, nonetheless, appeared at the hearing to explain this denial. Ms. Claeys testified that neither HHSC nor TMHP have any written criteria for determining whether a wheelchair with integrated standing feature will "serve a specific medical purpose," HR 1:14:04-1:14:43, and further admitted she did not know what medical necessity standard was applied in Jessica's case or what research was relied upon in reaching the decision to deny her request. HR 1:13:30-1:13:43; 1:12:57-1:13:10. She also testified that none of the medical purposes for which Jessica's medical professionals recommended a standing wheelchair - - the alleviation of chronic pain, the reduction of bone density loss, the reduction of spasticity and attendant contractures, improved respiratory function, the reduction of chronic constipation,

---

[9] HHSC's rule requires Medicaid hearing decisions to be issued within 90 days from the date the appeal request is received. 1 TEX. ADMIN. CODE § 357.23(a). In the present case, more than nine months elasped between Jessica's hearing request and the date of HHSC's hearing decision.

[10] At the hearing, HHSC had the burden to prove by a preponderance of the evidence that the four reasons for denial identified in TMHP's notice of adverse action were factually accurate and fully supported the agency's decision that no medical purpose would be served for Jessica by a custom power wheelchair with integrated standing feature. 1 TEX. ADMIN. CODE § 357.9; 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D). HHSC App. D.

and a decrease in the risk of skin breakdown - - justified approval of a wheelchair with integrated stander. HR 1:14:45-1:17:14. When asked to identify a medical purpose that could justify such approval, HHSC's nurse stated "I have not researched that to be able to answer" HR 1:19:30-1:19:35, and "I would need to get that from [HHSC's physician]." HR 1:17:16-1:17:29. Importantly, this witness agreed that Jessica's documentation established she has a medical need to stand. However, she also claimed this same documentation "did not speak to the specific component and the need for the stander to be part of a wheelchair." HR 1:02:11-1:02:34.

HHSC's second witness, Patricia Cannizzaro, is an employee of TMHP and offered testimony similar to that of HHSC's nurse.[11] She agreed there are no written criteria for determining whether a wheelchair with integrated stander is medically necessary and stated she did not know what criteria were applied to deny Jessica's wheelchair request. HR 2:59:31- 3:06:02; HR 2:58:37 - 2:58:42. She also claimed "there was no documentation in the information that was submitted that ruled out why a static stander could not meet her needs."[12] HR 3:11:53-3:12:08. As with HHSC's first witness, the TMHP witness did not acknowledge that Jessica's wheelchair evaluation and the letter of medical necessity provided by her

---

[11] Like Ms. Claeys, TMHP's nurse did not make the decision to deny Jessica's wheelchair request. HR 2:58:27-2:58:31.

[12] The terms "static stander" and "separate stander" are used interchangeably throughout this brief.

11

physician and physical therapist explained that "[n]either a posture control walker nor a static stander can provide the ongoing access to standing that Jessica requires to avoid the secondary medical complications that result from prolonged wheelchair sitting." AR 145, ¶2-4.

Both Jessica's physical therapist and the QRP testified at the hearing concerning Jessica's numerous medical conditions and her medical and functional need for the recommended wheelchair. For example, the therapist described how Jessica's dystonia "creeps up her legs, it reaches her trunk and causes spasticity of the diaphragm and all of the respiratory muscles making it very difficult for her to breathe at times." HR 3:25:40-3:25:59. In explaining her professional opinion that the recommended wheelchair will ameliorate or lessen the effects of Jessica's dystonia, the physical therapist testified that if Jessica can stand whenever the dystonia starts, she can "stop it in its tracks. And by stopping it, she also stops the back pain that comes with it, respiratory compromise and so forth." HR 3:30:05-3:31:20.

As to Jessica's bone loss, the therapist testified that "bones respond to the stresses applied to them so a lack of standing, lack of walking means that the bones become weaker, softer, they are more susceptible to fractures." HR 3:26:05-3:26:19. She further explained that frequent daily standing will reduce ongoing bone loss and help Jessica avoid pathologic fractures. HR 3:32:00-3:32:19. The

12

same is true for Jessica's chronic constipation, urinary tract infections, dysmenorrhea and menorrhagia, and the development of contractures, as all of these conditions can be ameliorated by frequent daily standing, which she can only achieve with the recommended wheelchair. HR 3:26:27-3:26:47; HR 3:26:58-3:27:17; HR 3:27:39-3:28:18; HR 3:28:25-3:28:37.

Jessica's physical therapist also offered further explanation as to why a separate stander would be ineffective in addressing Jessica's medical conditions:

> [T[he static stander stays in one location and Jessica travels in her day-to-day activities, and she doesn't know when the dystonia if going to kick in because of fatigue or because she's driven across a rough terrain in her power wheelchair. She doesn't know when it is going to kick in. And by having the integrated stander, when she feels it kick in, to start, she can immediately change into a standing posture and alleviate the dystonia or any back pain or respiratory compromise that is going on. HR 3:37:56-3:38:50.

On May 13, 2014, HHSC issued its decision sustaining TMHP's denial of the recommended wheelchair. HHSC App. B, AR 563-574. This decision contains twelve Findings of Fact, none of which address the reasons for denial identified in TMHP's September 12th notice of adverse action.[13] AR 58-60. The hearing officer's single Conclusion of Law states that:

> Because mobile standers, power standing systems on a wheeled mobility device are not a benefit of Home Health Services and

---

[13] While acknowledging Jessica's medical need to stand, this decision did not address the central question whether HHSC had offered probative medical evidence refuting the professional opinions of Jessica's treating health care providers that a wheelchair with integrated standing feature would serve numerous medical purposes for her.

exceptional circumstances for DME were not met, the decision by TMHP to deny Appellant a Permobil C500 VS power wheelchair with integrated standing feature and seat elevation system **WAS** in accordance with applicable law and policy, therefore the agency's action is **SUSTAINED**. (emphasis in original) HHSC App. B.

A timely request for administrative review was filed pursuant to 1 TEX. ADMIN. CODE § 357.703. AR 592-594. HHSC's final decision was issued on June 17, 2014, and contained the same twelve Findings of Fact and single Conclusion of Law issued by its hearing officer. HHSC App. C, AR 580-591. The reviewing attorney did not address the legal issues raised by Jessica, including the protracted nature of HHSC's benefit request procedures and untimely hearing process.

Jessica filed a Petition for Judicial Review in the Travis County District Court on July 14, 2015, challenging HHSC's hearing decision. CR 3-37. The district court reversed the agency's decision, finding that "the decision denying Plaintiff a custom power wheelchair with integrated standing feature is not supported by substantial evidence and is arbitrary and capricious." CR 226; HHSC App. A. HHSC subsequently filed this appeal.

## SUMMARY OF ARGUMENT

The district court's decision reversing HHSC's denial of Jessica's request for Medicaid authorization of a custom power wheelchair with integrated standing feature is correct and should be affirmed. As the district court determined, HHSC's administrative decision is not supported by substantial evidence and is

14

arbitrary and capricious. At the Medicaid fair hearing, HHSC had the burden to prove by a preponderance of the evidence that its reasons for denying Jessica's wheelchair request, as identified in TMHP's notice of adverse action, were factually accurate and that these reasons supported the agency's determination that the recommended custom power wheelchair with integrated standing feature would not serve a medical purpose for her. 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D). HHSC failed to meet this burden as its witnesses offered no probative medical evidence refuting the professional opinions of Jessica's treating health care providers as to the numerous medical purposes served by the recommended wheelchair and their opinion that no alternative item of DME would meet Jessica's medical need to stand throughout the day, at home and in the community.

HHSC's hearing decision is also arbitrary and capricious in that it is not grounded in any factual evidence within the administrative record. Not one of the agency's twelve Findings of Fact in the hearing decision identifies any evidence provided by HHSC that refutes the professional opinion of Jessica's medical providers that she requires a custom power wheelchair with integrated standing feature to meet her medical and functional need to stand numerous times throughout the day at home and in the community. HHSC's hearing decision cannot stand in the absence of such evidence. State law requires that an agency decision be reversed when substantial rights of the appellant have been prejudiced

15

by the agency's administrative findings, inferences, conclusions or decision. TEX. GOV'T CODE §2001.174(2). The district court's reversal of HHSC's administrative decision was correct and should be affirmed.

## ARGUMENT

I.  **The District Court Correctly Determined that Jessica Lukefahr is Entitled to Medicaid Authorization of a Custom Power Wheelchair with Integrated Standing Feature because HHSC's Administrative Decision Denying this Durable Medical Equipment is Unsupported by Substantial Evidence and is Arbitrary and Capricious.**

The district court correctly concluded that HHSC's hearing decision denying Jessica's request for a custom power wheelchair with integrated standing feature "is not supported by substantial evidence and is arbitrary and capricious." HHSC App. A. The reason for the court's decision is clear - - the single conclusion of law sustaining HHSC's denial of exceptional circumstances finds no support in the administrative record.[14] As explained by the court:

> The twelve findings do not provide any underlying facts to support the conclusory statement that "[b]ased on the findings of fact and applicable authority…the exceptional circumstances were not met." HHSC App. A, p. 3.

---

[14] In the district court, Jessica also argued that HHSC's conclusion that an integrated standing feature is not a benefit of home health was erroneous as the hearing officer failed to apply the correct test for DME coverage, as explained by CMS in its 2013 letter to the Texas Medicaid Director. Lukefahr App. A. This issue need not be resolved to affirm the district court's decision and is not repeated herein. Suffice it to say, by statute and rule, Texas Medicaid covers custom wheelchairs with "specialized or complex components." TEX. HUM. RES. CODE § 32.0425; 1 TEX. ADMIN. CODE § 354.1040. It is only TMHP policy that conflicts with state law and excludes integrated standing features from Medicaid coverage. 2013 TMPPM DME Handbook, §2.2.15.26. AR 468.

16

HHSC's claim that "properly supported findings of fact support the decision" is erroneous. HHSC's Brief, p. 18. No such findings of fact were made by HHSC's hearing officer as the administrative record contains no probative medical evidence supporting the agency's decision.[15] HHSC's further claim that "Ms. Lukefahr was unable to 'medically substantiate' that an integrated stander 'would serve a specific medical purpose' in her individual case…" is erroneous. HHSC's Brief, p.3. To the contrary, this is precisely what Jessica's medical evidence established and HHSC wholly failed to refute this evidence.

## A. HHSC Failed to Meet its Burden of Proof at the Fair Hearing.

At the hearing, HHSC had the burden to prove by a preponderance of the evidence that its reasons for denying Jessica's wheelchair request, as identified in TMHP's notice of adverse action, were factually accurate and that these reasons supported the agency's determination that the recommended custom power wheelchair with integrated standing feature would not serve a medical purpose for her. 1 TEX. ADMIN. CODE § 357.9; 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D).

This connection between the agency's denial notice and its final administrative decision is grounded in the basic due process protections afforded Medicaid beneficiaries. Due process dictates that HHSC provide legally sufficient notice, which includes "the reasons for the intended action" when denying a

---

[15] References to the hearing officer's decision include the decision of the reviewing attorney as they are essentially the same. HHSC App. B and App. C.

beneficiary's request for health care services.  42. U.S.C. § 1396a(a)(3); 42 C.F.R

§§ 431.210(b) and (c).  The reason for this detailed notice was explained in *Gray*

*Panthers v. Schweiker,* 652 F. 2d 146, 158 (D.C. Cir. 1980):

> It is universally agreed that adequate notice lies at the heart of due process.  Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose and resembles more of a scene from Kafka than a constitutional process.  Without notice of the specific reasons for denial, a claimant is reduced to guessing what evidence can or should be submitted in response and is driven to responding to every possible argument against denial at the risk of missing the critical one altogether.

It necessarily follows that TMHP's denial notice established the framework

for the hearing and administrative review decisions. As the district court correctly

noted, HHSC's reasons for denying Jessica's wheelchair request form the

"common thread that runs through [each stage of this case] - the fair hearing, the

administrative review, and judicial review." CR 221; HHSC App. G, p. 1.  The

court did not "elevate" the due process required in this case as HHSC contends.[16]

HHSC Brief p. 6, n. 2;  p. 26, n. 12  The court simply acknowledged Jessica's due

process right to legally adequate notice and held the agency accountable for its

failure to prove the reasons for denial identified in this notice.  AR 58-60.

---

[16] HHSC cites no case law or other authority to support its claim that the "informal nature" of a Medicaid fair hearing somehow alters the due process that must be afforded Medicaid beneficiaries.  HHSC Brief, p. 26, n.12.  The same is true regarding HHSC's suggestion that "traditional due process" allows for a hearing decision that is not tied to the denial notice.  HHSC Brief, p. 6, n.2.  To the contrary, the district court's "common thread" statement is entirely consistent with "traditional" due process. *See Goldberg v. Kelly,* 397 U.S. 254 (1970); 42 U.S.C. § 1396a(a)(3); 42 C.F.R §§ 431.210(b) and (c).

As explained above, TMHP identified four reasons for denying Jessica's exceptional circumstances appeal. *See* pp.9-10 above. Three of these four reasons - that the wheelchair was requested to help Jessica progress at work, that she is unable to tolerate a standing program, and that she cannot move her arms against gravity - were abandoned early in the hearing when HHSC's first witness agreed that Jessica has a medical need to stand.[17] According to her sworn testimony, "a standing program is important to address the concerns that have been presented today. All of that documentation justifies standing…"[18] HR 1:26:55 - 1:27:12. As the district court correctly noted, HHSC's concession of Jessica's medical need to stand "narrow[ed] the question to whether a static stander suffices, or instead, only a mobile stander meets medical necessity." CR 222; HHSC App. G, p. 2.

HHSC offered <u>no</u> evidence at the fair hearing to refute the professional opinion of Jessica's treating medical providers on this salient point. Notably, neither of HHSC's witness testified that a wheelchair with integrated standing feature is not medically necessary as neither is qualified under Texas Medicaid's requirements to determine Jessica's clinical need for a power wheelchair with

---

[17] TMHP identified these three reasons as support for its initial determination that Jessica does not have a medical or functional need to stand. HHSC abandoned this claim at the fair hearing.

[18] From the outset, this case has been about Jessica's medical need to <u>stand</u>. The agency now suggests that Jessica's medical need is to "change position frequently" which, they claim, can be accomplished with non-standing wheelchair components. HHSC Brief p. 23. This assertion has no support in the administrative record and contradicts the testimony of HHSC's witness who affirmed Jessica's medical need to stand.

19

custom components.[19]  HHSC's claim that Ms. Claeys offered such testimony is incorrect.  HHSC's Brief, p.8.  Instead, she erroneously testified that Jessica's documentation "did not speak to the specific component and the need for the stander to be part of a wheelchair." HR 1:02.11-1:02.34.

TMHP's employee also erroneously testified "there was no documentation in the information that was submitted that ruled out why a static stander could not meet her needs."[20]  HR 2:59:31-3:60:02.  However, Jessica's documentation readily disproves the testimony of HHSC's witnesses. The wheelchair evaluation and letter of medical necessity provided by Jessica's physician and physical therapist specifically explained why a separate stander would not meet Jessica's medical and functional need to stand:

> It is important to note that Jessica requires moderate assistance from a care provider to use a posture control walker or static stander and she does not have continuous access to care providers to provide the assistance she needs to use these separate devices. In contrast, the recommended wheelchair with standing feature will enable Jessica to independently stand in any location in her home or when she is in the community. . .

---

[19] By rule, HHSC requires that a licensed physical or occupational therapist, in conjunction with a qualified rehabilitation professional (QRP) conduct a clinical assessment of a beneficiary seeking a custom wheelchair from Texas Medicaid.  1 TEX. ADMIN. CODE § 354.1040(c)(1-4). AR 109-115.

[20] HHSC suggests there is some significance to the fact that "no prior authorization request for a static stander has been submitted to Texas Medicaid."  HHSC Brief p.9. While this fact is true, it is also irrelevant. There also was no prior authorization request for a postural walker as Jessica's medical professionals determined that both of these items of DME will not meet her medical and functional need to stand. And as the district court correctly noted, this point was not identified as a reason for the denial in TMHP's notice to Jessica. CR 222, HHSC App.G, p. 2, n. 3.

There is no alternative item or combination of items of DME that will address all of Jessica's medical and functional needs and promote her health and well-being. Neither a posture control walker nor a static stander can provide the ongoing access to standing that Jessica requires to avoid the secondary medical complications that result from prolonged wheelchair sitting. Nor do these devices afford Jessica the ability to stand where she can perform activities of daily living or accomplish other functional tasks. AR 145, ¶2-4.

This documentation also disproves HHSC's current suggestion that Jessica's physician stated she could independently transfer to a separate stander. HHSC's Brief, p.7, n.4. As noted above, both Jessica's physical therapist and physician were clear that Jessica requires caregiver assistance to transfer to a separate standing device. AR 145. Her limited ability to transfer to and from her wheelchair with use of the chair's transfer bars does not alter the fact that she cannot transfer into a separate stander as the point of entry is different for these two items of equipment, as is the transfer process. Moreover, Jessica testified under oath that she cannot self-transfer into a separate stander and would require assistance from a personal care provider to use this device.[21] HR 35:17-35:32 (second day). She further testified that a separate stander would not meet her needs because "it cannot be moved and it cannot go with you." HR 35:57-35:60. HHSC offered no evidence at the fair hearing that refuted Jessica's testimony or that of her physician and physical therapist on this point.

---

[21] Jessica also testified about transfer injuries she has experienced in the past, including a broken metatarsal in her right foot that required surgery to correct. HR 36:01-36:28 (second day).

Jessica's physical therapist also testified at the fair hearing and again explained why a separate stander would be ineffective in addressing her medical conditions:

> [T[he static stander stays in one location and Jessica travels in her day-to-day activities, and she doesn't know when the dystonia if going to kick in because of fatigue or because she's driven across a rough terrain in her power wheelchair. She doesn't know when it is going to kick in. And by having the integrated stander, when she feels it kick in, to start, she can immediately change into a standing posture and alleviate the dystonia or any back pain or respiratory compromise that is going on. HR 3:37.56- 3:38.50.

She further testified that a separate stander would not address Jessica's functional need to stand. In response to the question whether a wheelchair with an integrated standing feature and a separate stander would be equally effective in helping Jessica perform activities of daily living, Jessica's therapist responded:

> No. It's the functional component, the static stander stays in one location. If it's in the living room, it stays in the exact two foot square. The power wheelchair with integrated stander is able to move to the different parts of the apartment where she can use the standing at the bathroom mirror to get herself ready for work, to reach into the cabinet to get her medicines, to take them at the appropriate time. To be able to stand safely and cook a meal, reach into her cupboards in the kitchen, those were the things I've tried to paint a picture of in the documentation. HR 3:40.56-3:41-22.

> I think it will help her certainly to cook on a stovetop. Currently from her power wheelchair, she's not able to see into a low pot to see, you know, whether it's boiling or not. She's at greater risk of sustaining burns because the pot is going to tip over onto her. She can perform oral hygiene, address her hair, all of those things far better in a standing position at the bathroom counter than in a seated position.

22

Upper body dressing can be made easier in a standing position.[22] HR 3:44.18-3:45.12.

HHSC's claim that the TMHP nurse testified that Jessica "has a medical need to stand for one hour a day, five days per week to strengthen her muscles" is also incorrect. HHSC Brief, p. 8. This was not her testimony as she has never seen Jessica and is not qualified to prescribe a standing regimen for her. In fact, her testimony was limited to explaining her understanding of certain research studies addressing the positive effect of standing on bone density.[23] Importantly, this witness failed to refute the professional opinion of Jessica's treating health care providers that a static stander will not meet Jessica's medical or functional need to stand numerous times throughout the day to address her many medical conditions,

---

[22] Jessica also testified she could perform activities of daily living with the recommended wheelchair:

> Well, I could reach my cabinets for things such as kitchen utensils and pots and pans. I could actually use my oven to cook because in my current chair, I am only in the seated position so I am not able to open and close the oven door or operate the oven. I also have a top-loading washer and dryer for my laundry and I cannot operate those by myself because I cannot reach them. Also, I could get into and out of my pantry and my medicine cabinet and access mirrors and that sort of thing that I cannot access at this time, with my current chair. HR 31:54-32:31 (second day)

[23] The nurse's actual testimony was:

> And the literature that's out there shows that it does help with preventing - - the static standers help with - - preventing loss of bone density and that the - - - - usually it's like approximately an hour a day or more, at least five times a week is the level that is considered to meet a therapeutic need.

23

including the dystonia that can occur anywhere, at any time, but can be "stop[ped] in its tracks" by standing.[24]  HR 3:36.56-3.37:03.HR 2:07.02-2:07.31.

Nor did the TMHP witness testify that the features on Jessica's current wheelchair will meet her medical needs as HHSC now claims.  HHSC Brief, p. 23. As previously explained, TMHP's nurse is not qualified to identify alternative treatment for Jessica's numerous medical conditions as she is not a physical therapist or physician and has never even seen Jessica.  And, as found by the district court,  HHSC's concession that standing is medically necessary for Jessica negates any argument that other non-standing wheelchair features, like tilt and recline, will suffice.[25]  CR 222; HHSC App. G, p.2.

In the absence of any probative testimony from qualified medical providers rebutting the opinions of Jessica's health care professionals, HHSC seeks support for the agency's decision in Ms. Cannizzaro's interpretation of the medical literature included in Jessica's exceptional circumstances appeal.[26]  HHSC's Brief, p. 10.  This testimony is of no consequence for two reasons. First, as this witness acknowledged at the hearing, TMHP did not identify any perceived deficiency in the medical literature as a basis for the denial in its notice of adverse action to

---

[24] Jessica also addressed the unpredictability of the onset of her dystonia and her need to address the resulting pain while away from home.  HR 31:10-31:34 (second day).

[25] At the fair hearing, Ms. Cannizzaro conceded that TMHP's conclusion that Jessica is unable to benefit from a standing program was "a little incorrect."  HR 3:08:54-3:09:20.

[26] HHSC's hearing officer did not identify any medical literature as a basis for his decision. HHSC App. B.

24

Jessica. HR 2:24:28-2:24:44. Second, her interpretation of the literature was patently incorrect. Specifically, she testified that a research study entitled *Load Distribution in Variable Position Wheelchairs in People with Spinal Cord Injury*, "concludes that standing in a static stander or the use of tilt and recline features can prevent skin breakdown…and did not indicate that both were needed."[27] HHSC's Brief, p. 10. This is inaccurate as this study investigated the effectiveness of three *wheelchair* positioning features - tilt, recline, and standing - in reducing pressure on the user's seat and back. Use of a separate stander was not part of the study or its findings. Importantly, the researchers determined that wheelchair "standing was the only configuration that decreased loads off of the seat and backrest simultaneously… ." They did not conclude that these wheelchair components offer the same benefits as HHSC now contends. HHSC Brief, p.24. Regardless of Ms. Cannizzaro's erroneous testimony about this research study, HHSC failed to provide any medical evidence that a wheelchair with a tilt/recline feature will alleviate Jessica's dystonia and resulting pain and respiratory compromise, reduce the risk of contractures, stop the further loss of bone density, decrease constipation, or address the pain associated with severe dysmenorrhea and menorrhagia.

---

[27] *See* Sprigle S, Mauer C, Sorenblum S. *Load redistribution in Variable Position Wheelchairs in People with Spinal Cord Injury.* Journal of Spinal Cord Medicine, February 2010; 33(1):58-64. AR 197-203.

TMHP's testimony concerning an article entitled *RESNA Position on the Application of Wheelchair Standing Devices* was also erroneous. Dismissing this report as an "opinion paper," HHSC's witness failed to acknowledge that it was published in the peer-reviewed journal *Assistive Technology*, 21;161-168 (2009), and is based upon a review of more than 40 relevant studies concerning the medical effects of standing for individuals with severe mobility disabilities. In fact, this review describes "evidence from the literature supporting the use of wheelchair standers" and explains that "wheelchair standing devices are often medically necessary, as they enable certain individuals to: …maintain vital organ capacity…maintain bone mineral density…reduce abnormal muscle tone and spasticity, reduce the occurrence of pressure sores…and skeletal deformities."[28] AR 90-91.

On appeal, HHSC repeatedly claims that "the evidence showed that a static stander would meet [Jessica's] medical needs" but completely fails to identify any probative evidence in the record on this point. For example, HHSC cites TMHP's denial notice as support for this claim, but a denial notice is not proof of the assertions made therein. HHSC's Brief, pp. 19, 20. Rather, it identifies the reasons for denial that HHSC must establish at the hearing in order to meet its burden of proof.

---

[28] Contrary to HHSC's claim, its nurse did not directly address either of these articles in her testimony. HHSC Brief. p. 10.

26

Moreover, HHSC claims that its witnesses testified that a separate stander would meet Jessica's medical need to stand, HHSC Brief, p.19, but this is not what their testimony states. As explained above, both witnesses erroneously testified that Jessica's documentation did not rule out why a static stander could not meet her needs. But, in fact, Jessica's documentary evidence and the sworn testimony offered by her medical providers did exactly that and HHSC's witnesses failed to rebut this evidence.

Importantly, HHSC's hearing officer cannot simply ignore the medical evidence provided by Jessica's treating medical providers and the agency's failure to refute this evidence. A longstanding principle of the Medicaid program holds that treating medical providers must play a central role in determining the medical necessity of requested services. As stated in the legislative history of the Medicaid Act:

> The committee's bill provides that the physician is to be the key figure in determining utilization of health services - and provides that it is a physician who is to decide upon admission to a hospital, order tests, drugs and treatments, and determine the length of stay. For this reason the bill would require that payment could be made only if a physician certifies to the medical necessity of the services furnished.

S.Rep. No. 404, 89th Cong., 1St Sess., reprinted in 1965 U.S.C.C.A.N. 1943. *See also Weaver v. Reagan*, 886 F.2d 194, 200 (8th Cir. 1989) (finding that "[t]he Medicaid statute and regulatory scheme create a presumption in favor of the medical judgment of the attending physician in determining the medical necessity

27

of treatment."); *Pinneke v. Preisser*, 623 F.2d 546, 550 (8th Cir. 1980) (stating that "[t]he decision whether or not certain treatment or a particular type of surgery is 'medically necessary' rests with the individual recipient's physician and not with clerical personnel or governmental officials.")

The professional opinion of Jessica's medical providers that a wheelchair with integrated standing feature will serve numerous medical purposes for her is controlling in light of HHSC's failure to rebut this evidence. In *Johnson v. Minn. Dept. of Human Servs.*, 565 N.W. 2d 453,458 (Minn. App. 1997), the court rejected the state Medicaid agency's claim that a separate stander was adequate to meet a Medicaid beneficiary's medical needs in lieu of a wheelchair with integrated standing feature. There, the plaintiff was unable to access a separate stander without caregiver assistance and was at risk of transfer injuries each time he was moved in and out of his wheelchair. Given these facts, the court found that a wheelchair with integrated standing feature was medically necessary for him.

The same is true in the present case. A separate stander will not meet Jessica's medical need to stand to alleviate pain or to address the numerous other medical conditions she experiences. HR 3:42.18-3:42.40. As the district court correctly noted, "[t]here is no evidence rebutting [Jessica's] treating physician's statement that she would need assistance from a care provider to use a static

28

stander or the fact that she does not have a care provider throughout the day." [29]

CR 224; HHSC App. G, p. 4. Nor is there any explanation how a separate stander would provide relief when Jessica cannot access this device away from home.

The Eleventh Circuit's decision in *Moore v. Reese,* 637 F.3d 1220 (11th Cir. 2011), provides no support for HHSC's failure to refute Jessica's medical evidence in this case.[30] In *Moore,* the court examined the respective roles of a beneficiary's treating health care provider and the state in determining medical necessity for Medicaid services. Rejecting the state's claim that it should have the last word on medical necessity, the Court noted that "[w]hile Congress could have conferred the 'final arbiter' role to the state, it did not." *Id* at 1259. Here, too, HHSC cannot be the final arbiter of Jessica's medical need for a custom power wheelchair with integrated standing feature in the absence of any credible medical evidence refuting the professional opinions of her treating health care providers.

The district court's decision concerning the evidence in this case was not a close call. As explained, "the question for the court then is reduced to whether there is substantial evidence to support THHSC's claim that a static stander can meet [Jessica's] medical needs or to support its claim that she is physically

---

[29] In contrast, Jessica was able to independently stand using a Permobil C500 VS during the evaluation, AR 571; HHSC App. B, FOF No. 6, and to perform numerous activities of daily living with this wheelchair.

[30] Nor does *Beal v. Doe,* 432 U.S. 438 (1977), support HHSC's position. To the contrary, the Court specifically noted that "[s]erious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage…" *Id.* at 444. Yet, this is precisely what HHSC has done concerning custom wheelchairs with integrated standing features.

incapable of benefitting from a mobile stander." HHSC App. G, p. 4. "The 'substantial evidence' test provides that a court reviewing an agency action shall reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced and the agency's findings are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole. *Id.* at § 2001.174(2)(E). *Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n,* 910 S.W.2d 147, 154 (Tex. App. 1995), writ denied (Apr. 12, 1996). This is precisely what the district court did in this case when it determined that HHSC failed to rebut the evidence of Jessica's treating medical providers concerning her medical need to stand numerous times throughout the day with the use of a wheelchair with integrated standing feature. The district court's determination that HHSC's hearing decision is not supported by substantial evidence is correct and should be affirmed.

**B.      The Hearing Officer's Findings of Fact Do Not Support HHSC's Final Decision.**

Proper findings of fact, which are more than a "mere conclusion or a recital of evidence" are required to support HHSC's administrative decision. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.,* 665 S.W.2d 446, 451 (Tex. 1984) (citations omitted). The agency's hearing officer issued twelve Findings of Fact to explain his ultimate conclusion that "exceptional circumstances were not met" in this case. However, not one of these twelve Findings identifies

30

any evidence provided by HHSC that refutes the professional opinion of Jessica's medical providers that she requires a custom power wheelchair with integrated standing feature to meet her medical and functional need to stand numerous times throughout the day at home and in the community. HHSC's claim that "[t]he district court erred in finding that the hearing officer failed to make findings of fact" is itself erroneous as this is not what the court said. HHSC Brief p. 28. Rather, the district court explained the agency's Findings this way:

> Of the twelve Findings of Fact, six merely recite the procedural history of the case. Of the remaining six, one references the absence of a prior authorization evaluation that was not required or related to medical necessity. Two others identify Ms. Lukefahr's current wheelchair and the inseparability of the standing feature on the wheelchair requested, both of which are immaterial. (Ms. Lukefahr has not requested a wheelchair *without* a mobile stander.) Two *support* Ms. Lukefahr's position. The first concedes that a static stander is a medical necessity for Ms. Lukefahr, which negates any argument that a tilt/recline, a posture control walker, or other non-standing features will suffice. It narrows the question to whether a static stander suffices or, instead, only a mobile stander meets medical necessity. The second favors Ms. Lukefahr by conceding she can fully operate the requested wheelchair. The final Finding recites the conclusion of THHSC's OMD that the requested chair was not medically necessary. This is not a factual finding arising from the hearing; it is a pre-existing fact and *the reason for* the hearing. (emphasis in original).

Ultimately, the district court determined that "[t]he twelve Findings do not provide any underlying fact to support the conclusory statement that 'based on the finding of fact and applicable authority…the exceptional circumstances was not met.'" CR 223; HHSC App. G, p. 3.

31

HHSC now attempts to salvage the agency's decision by claiming it is supported by two of the twelve Findings. This is incorrect. Finding of Fact No. 5 simply acknowledges that Jessica "does not currently have a static stander and was not evaluated for prior authorization of one."[31] This finding does not provide any support for the hearing officer's determination that "exceptional circumstances were not met." TMHP's exceptional circumstances policy required Jessica's treating medical providers to submit a letter of medical necessity documenting alternative DME items that had been tried or ruled out and an explanation of why these items were ruled out. AR 518. This letter is precisely what Jessica's medical providers submitted to TMHP and was further supported by their testimony at the fair hearing. HHSC's claim that Jessica's "failure to rule out the use of a static stander in accordance exceptional circumstances review policy" completely ignores the medical evidence submitted on Jessica's behalf. HHSC Brief, p. 21. The unrefuted testimony of Jessica's medical providers is that a wheelchair with integrated standing feature will serve numerous medical purposes for Jessica and a static stander will not.

Finding of Fact No. 12 also provides no support for the hearing officer's decision as this finding merely acknowledges that TMHP did not dispute that Jessica "met medical necessity for a static stander or that these items meet DME

---

[31] Contrary to HHSC's suggestion, there is no requirement that there be a "prior authorization evaluation" for each DME item that is ruled out. HHSC App. E.

32

criteria."[32] The question here is whether HHSC offered any probative evidence to refute the professional opinion of Jessica's health care providers that a wheelchair with integrated standing feature is medically necessary for her. HHSC's failure to provide such evidence does not allow the hearing officer to sidestep this question and ignore the specific medical equipment that Jessica's treating medical providers recommended for her, but this is exactly what Finding No. 12 does.

One additional point about Finding No. 12 bears mention. While HHSC agrees that Jessica has a medical need to stand, the agency continues to erroneously claim that Jessica's medical needs can be met through the use of non-standing wheelchair functions including tilt and recline, seat elevation and leg elevation functions. HHSC Brief p.23. And although HHSC states there is no dispute concerning these wheelchair features, the agency simply ignores the fact that the hearing officer also denied Jessica a seat elevation system, a wheelchair component that Medicaid approved on her current wheelchair more than six years ago. HHSC Brief, p.7. *Compare* HHSC App B, FOF No. 3. and Conclusion of Law.[33]

---

[32] On appeal, HHSC misinterprets Finding No. 12 to say that "Ms. Lukefahr met DME criteria for a power wheelchair and static stander." HHSC Brief, p. 19, n.9. This is incorrect. The point the hearing officer was attempting to make was that wheelchairs and static standers meet DME criteria, not that Jessica meets these criteria.

[33] The hearing officer's denial of a seat elevation system makes no sense in light of Finding of Fact No. 3. HHSC App. B.

Other errors in the hearing officer's Findings exist as well. Finding No. 9 states, in part that:

> [t]he HHSC Office of the Medical Director (OMD) reviewed [Jessica's] clinical information and determined that the client's condition did not meet the clinical criteria for the Exceptional Circumstances provision for a Permobil C500 VS power wheelchair with integrated standing feature.

As to this Finding, the district court correctly noted that it simply "recites the conclusion of THHSC's OMD that the requested chair was not medically necessary" and represents "*the reason for the hearing*." CR 222; HHSC App. G. p. 2. Additionally, however, this recitation of OMD's statement illustrates a critical defect in HHSC's case as both HHSC witnesses testified without reservation that neither HHSC nor TMHP have any clinical criteria for determining whether an integrated standing feature will serve a specific medical purpose. HR1:15.30-1:15.45. The hearing officer ignored this obvious contradiction between the OMD's written statement and the testimony of its witnesses.

HHSC suggests that the hearing officer's statement that he "has carefully considered the evidence contained in the hearing record and makes findings of fact and conclusions of law based on the weight of the evidence…" was sufficient to "fulfill his duty" in the case. HHSC Brief, p. 28. Again, this is incorrect. The hearing officer's use of boilerplate language typically recited in HHSC's Medicaid hearing decisions does not change the undeniable fact that none of his findings

34

establish the accuracy of the reasons given for denial in TMHP's notice of adverse action or even suggest that HHSC refuted the professional opinions of Jessica's medical providers that a wheelchair with integrated standing feature will serve numerous medical purposes for her and that no other item of DME will suffice.

"An agency acts arbitrarily if it makes a decision without regard for the facts, if it relies on fact findings that are not supported by any evidence, or if there does not appear to be a rational connection between the facts and the decision." *Heritage on San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality,* 393 S.W.3d 417, 423 (Tex. App. 2012), review denied (Mar. 29, 2013), citing *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819–20 (Tex. App.—Austin 2011, pet. denied). *See also City of El Paso v. Public Util. Comm'n of Tex.,* 883 S.W. 2d 179, 184 (Tex. 1994). Here, all three fatal defects are present in HHSC's decision. As such, there is no reasonable basis for HHSC's decision. The district court's determination that HHSC's decision is arbitrary and capricious should be affirmed.

## II. HHSC's Administrative Review Does Not Comport with Agency Requirements.

In its final argument, HHSC seeks to defend the administrative review that was conducted in this case by claiming it afforded Jessica all of the due process to which she was entitled. This argument misses the mark. The district court reversed the agency's decision because it is not supported by substantial evidence and is

35

arbitrary and capricious. The deficiencies in the administrative review process are just another example of why the district court's reversal of the agency decision is correct. HHSC's reviewing attorney did not conduct a "review of the hearing decision and the record upon which it is based *for errors of law and errors of fact…*" as required by 1 TEX. ADMIN. CODE § 357.703(b)(3).[34] (emphasis added) Instead, he merely repeated the twelve Findings of Fact and single Conclusion of Law issued by the hearing officer, despite the fact that none of the Findings provide any support for the agency's decision that a custom power wheelchair with integrated stander would serve no medical purpose for Jessica. Contrary to HHSC's claim, it was not enough for the agency attorney to simply review the hearing officer's decision and notify Jessica of the result. HHSC's Brief, p. 29. He was required to review the decision for errors of law, including the procedural errors raised by Jessica concerning the protracted nature of HHSC's benefit request process and the agency's failure to provide a timely hearing as required by federal and state Medicaid rules.[35] This did not happen.

---

[34] The resolution of legal issues in an administrative review is particularly important because Medicaid hearings are conducted by non-attorneys. Moreover, federal guidance on DME coverage is clear that the fair hearing process must determine whether a decision denying DME is contrary to federal Medicaid requirements. HHSC App. H.

[35] The nine month delay between Jessica's hearing request and decision also violates federal Medicaid requirements for a timely hearing. 42 C.F.R. § 431.244(f). *See Shakhnes ex rel. Shakhnes v. Eggleston,* 740 F. Supp. 2d 602, 616 (S.D.N.Y. 2010) *aff'd in part, vacated in part sub nom. Shakhnes v. Berlin,* 689 F.3d 244 (2d Cir. 2012) (noting that "[t]he regulation demands that 'final administrative action' be taken 'ordinarily, within 90 days' after a request for a fair hearing.")

Moreover, as the district court correctly observed, the reviewing attorney appeared to conflate two different standards of review, referring both to the "preponderance of the evidence" and "substantial evidence" in reaching his decision. It is not enough for HHSC to come behind this decision and claim that the words the attorney used are not what he meant. HHSC's administrative review was nothing more than a rubber stamp of the erroneous decision issued by the agency's hearing officer and further demonstrates the agency did not "genuinely engage[] in reasoned decision-making" in this case. *Starr Cnty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.) *quoting Texas Medical Assn. v. Mathews,* 408 F. Supp. 303, 305 (W.D. Tex. 1976.)

## CONCLUSION AND PRAYER

For the reasons described above, Appellee Jessica Lukefahr respectfully requests this Court to affirm the district court's decision reversing HHSC's denial of her request for a custom power wheelchair with integrated standing feature so that Jessica can finally obtain Medicaid approval of the wheelchair recommended by her treating medical professionals.

Respectfully submitted,

  /s/ Maureen O'Connell
MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
(512) 458-4800 (Phone)
(512) 458-5850 (Fax)
moconnell458@gmail.com

*Attorney for Appellee*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because it contains 9,679 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

  /s/ Maureen O'Connell
MAUREEN O'CONNELL

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of October, 2015, a true and correct copy

of the foregoing document was electronically filed, and that a true and correct copy

of the foregoing document was served by electronic mail on the same date to:

Kara Holsinger
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

   /s/ Maureen O'Connell
MAUREEN O'CONNELL

**No. 03-15-00325-CV**

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

JESSICA LUKEFAHR,

*Appellee.*

_____

On Appeal From
The 345th Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-002158
The Honorable Judge Stephen Yelenosky

_____

**APPELLEE'S APPENDIX**
_____

MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
T: 512.458.5800
F: 512.458.5850
moconnell458@gmail.com

*Attorney for Appellee*

# APPENDIX INDEX

CMS Letter to Texas Medicaid, May 21, 2013 ..................................................Tab A

# TAB A

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-14-26
Baltimore, Maryland 21244-1850


CENTERS for MEDICARE & MEDICAID SERVICES

Center for Medicaid and CHIP Services
Disabled and Elderly Health Programs Group (DEHPG)

May 21, 2013

Kay Ghahremani
State Medicaid Director
Texas Health and Human Services Commission
Brown-Heatly Building
4900 N. Lamar Blvd.
Austin, TX 78751-2316

Dear Ms. Ghahremani:

The Centers for Medicare & Medicaid Services (CMS) is writing to clarify our policy on the medical supplies, equipment and appliances (often referred to as Durable Medical Equipment, or DME) that will receive Federal reimbursement.

DME is a component of the home health benefit, which is a mandatory service within the Medicaid program. As such, items of DME meeting the state's definition of such coverage is to be provided to individuals (of any age) meeting the State's medical necessity criteria. In addition, CMS issued a letter to State Medicaid Directors on September 4, 1998 (see attached) interpreting state responsibilities in providing medical equipment in response to the DeSario court decision. This guidance requires states to have a reasonable process for beneficiaries to request items of DME not on a pre-approved list, and the ability for a beneficiary to request a fair hearing to appeal negative determinations.

We understand that the State of Texas is not approving requests for ceiling lifts provided to adult Medicaid beneficiaries, due to prior CMS guidance indicating that Federal reimbursement is not available. We are clarifying here, in a way that supersedes prior CMS guidance on this topic, that coverage of ceiling lifts under the medical equipment benefit is an issue that states must determine consistent with the process described in the September 4, 1998 guidance, and that federal reimbursement is available to the state to the extent that the item is determined to be covered. This means that medically necessary ceiling lifts will be reimbursed by CMS as part of the Texas home health benefit if these lifts meet the state's definition of DME.

In addition, we would like to make sure you're aware of a Notice of Proposed Rulemaking issued July 12, 2011. That regulation proposed changes to the home health benefit to not only codify face-to-face encounters required at section 6407 of the Affordable Care Act, but to also propose definitions of a medical supply, equipment and appliance. Also included was a proposal that any item meeting any of those definitions must be covered under the state plan, and may not be reserved for coverage under a 1915 (c) home and community based services waiver. We are working now to issue a final regulation. We encourage you to familiarize yourself with the provisions of that proposed rule.

| JL - 33

000515

We hope this alleviates any confusion.  Don't hesitate to contact me with any questions.

Sincerely,

/s/

Melissa Harris
Director
Division of Benefits and Coverage

Cc:  Billy Bob Farrell, Dallas Regional Office

000516